Lesley R. **BEAGEL**, Appellant,

v.

**STATE of Alaska, Appellee.**

No. A–3457.

Court of Appeals of Alaska.

June 28, 1991.

Jeffrey M. Feldman, Gilmore & Feldman, Anchorage, for appellant.

Shelley K. Chaffin, Asst. Atty. Gen., Office of Sp. Prosecutions and Appeals, Anchorage, and Charles E. Cole, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., COATS, J., and ANDREWS, Superior Court Judge.*

OPINION

COATS, Judge.

Lesley R. Beagel was charged with murder in the first degree for the death of her husband, David Beagel. AS 11.41.100. A jury convicted Beagel of the lesser-included offense of manslaughter. AS 11.41.120. Beagel appeals, raising several issues. We reverse Beagel's conviction.

On the evening of August 20, 1989, Lesley Beagel called 911 for assistance. The telephone call was tape-recorded. During this call, Beagel stated that her husband had been shot at their house and needed an ambulance. When asked who shot her husband, Beagel responded, "Yes. I shot my husband." The following exchange then occurred:

DC [911 operator]: What did you shoot him with?

LB [Beagel]: I don't know. It's his gun, he gave it to me, he told me to shoot him.

DC: Is it a pistol?

LB: Yes, its a small gun. I don't know what it is.

DC: Okay.

LB: He gave it to me and he said, we were fighting and he said, "Fine, shoot this," and I did. I didn't think it had anything in it.

DC: Okay. Where's the pistol now?

LB: I don't know. I think I laid it down. I don't know where it is. It's laying in the living room. I don't know.

. . . .

LB: But I shot him in the head, God.

Officers from the Anchorage Police Department and the Alaska State Troopers arrived at the Beagel residence shortly after the paramedics. Beagel was sobbing and hysterical. She told Trooper Gibson that her husband had handed her the gun and told her to shoot him. Gibson then saw David Beagel lying on his back in the living room area; there was a bullet wound near the center of his forehead, but he was still alive.

Trooper Zabala arrived a few minutes later, and was instructed to relieve Trooper Rowe who had taken Beagel to the master bedroom. Zabala testified that Beagel was being kept in the master bedroom so that she would not interfere with the investigation in the living room. Mr. Beagel was still in the living room where several paramedics were attending to him. Before Rowe left the bedroom, Beagel made statements such as "I killed him, I killed him."

Zabala asked Rowe to get a tape recorder. Rowe went outside and returned with the tape recorder. During the time she was in the bedroom, Beagel was not physically restrained. Prior to making the recorded statements, Beagel was not given

* Sitting by assignment made pursuant to article IV, section 16 of the Alaska Constitution.

*Miranda* warnings. However, Zabala testified that if Beagel had tried to leave after making her initial unrecorded statements, he probably would not have let her leave the residence.

After Zabala turned on the tape recorder, Beagel made the following statements:

ZABALA: I'm at a residence at, uh, 12440 Alpine Drive.

BEAGEL: I, did I kill him? Oh my God! I want him back now, bring him back please. Oh no, I want David back. We're going on vacation in a week, and now I want him back now. I want him back. Oh no, God. I want him back. Oh (crying). He gave me the gun, he did, he said, he knocked everything over cause he was mad at me, and, oh shit.

Zabala continued to ask preliminary questions concerning the victim's name and age. When Zabala asked to see Beagel's driver's license, she responded:

Oh my God. He gave me the gun and he never loads his gun. He never does. I never use guns. I don't know, I don't know.

When Zabala asked Beagel if she was taking any drugs, she stated:

I don't do drugs. I want David. Can I, I want to go to the hospital now, okay. I want to see David. No I want to see David. I'll probably be arrested for murder huh? Oh Jesus. We're going on vacation. We're gonna get, we're gonna be married fifteen years, we're gonna renew our wedding vows. All the above, like in two weeks, week and a half. Damn him for giving me that fucking gun. He walked up and gave it to me and he was just so mad because I was gonna go to a doctor, he gave me that gun. He never loads his gun, he never does. I don't understand, I don't understand this at all (crying). God, is he alright, I want him to be alright, we're going on vacation. Soon, real soon, we're going on vacation. Damn him with that fucking gun of his. Oh shit, do you think he is going to be alright?

When Beagel made this last remark, she was standing on the porch of the house with Zabala. She wanted to leave and go to the hospital. When she started walking down the steps to the house, Zabala grabbed her arm and directed her back inside to the "TV room." At that point, Zabala decided that Beagel was not free to leave and he read her her *Miranda* rights.

After Zabala read Beagel her rights, the following exchange occurred:

ZABALA: Okay. Having these rights in mind, do you wish to talk to me?

BEAGEL: I don't know. No, I guess not. I don't know. What am I going to say to you? He brought me, we were fighting and he brought me the gun out, and he, that's what he did. I don't know shit. No, I don't want to talk to you I guess. Oh, I want David back, just bring him back and it will all be over okay. Please do it, just please do it. (crying) I want him back. Oh, God. I bet I killed him didn't I. I love him. I'm gonna remarry him. Oh Jesus. We (inaudible) fight tonight. Oh God. Oh God. Oh Jesus, I don't believe this. Oh God, what is this. I killed him, I bet I killed him. Oh God. Why did he give me that fucking gun, God damn him. I'm mad at him for that. (inaudible) even loaded. He never loads it. Why he probably did it on purpose. I bet he did it on purpose. How could he do that on purpose. Oh my God. We're gonna get remarried in a week and a half in Las Vegas, we're gonna renew our 5th. We've been married 15 years. We were gonna renew it. Oh shit. I want him back now. I want him back. He got mad at me tonight. We fought, we did ya know, oh God. How is he. He's not good, is he?

ZABALA: Ma'am, do you have any kids?

BEAGEL: No, I don't have any children. I can't have children. That's our problem. That's why we were fighting tonight because I was gonna go to a fertility specialist and do something about it, and we got in a knock-down, drag-out fight, and he knocked everything over upstairs and then he came out and he handed me the gun. Oh God. Why did he have bullets in it, he never has bullets in that damn gun. Damn his ass. He

fucked everything up. He never does. Oh God. I bet you're taping everything, aren't you. Can I call my parents? I got arrested for murder, or what?

Zabala continued to tape-record the statements which Beagel was making, and she continued to make incriminating remarks such as "I guess I'm a good shot, huh?" and "Oh God, I shot him right in the head, oh my God, oh God."

At some point during this time, Zabala went to check the telephone to see if Beagel could call her parents. He testified that it appeared to be a party-line, and every time he picked it up there was someone else on it. Zabala was never able to let her call her parents because someone else was always on the phone.

During this period, Zabala went to his car to get more tape cassettes. Trooper Selden took the tape recorder, and asked Beagel if she had been told her rights. Selden testified that he knew that Beagel had been advised of her rights, but did not know that she had invoked them. The following conversation took place:

BEAGEL: Yes, and I probably said too much and I'm not saying anything else, okay.

SELDEN: I take it that you don't want to talk to me about it.

BEAGEL: Well you know, it is gonna be used against me so I can't see ... ya know.

SELDEN: Well, that's your decision.

BEAGEL: Well, what would you suggest?

SELDEN: Well, I know there are two sides to every story.

BEAGEL: Well, I agree ... God....

Zabala returned and saw Selden speaking to Beagel. He interrupted their conversation to say he had read Beagel her rights and she had invoked them.

After this, the Troopers did not ask Beagel any other questions. They responded to Beagel's questions, and made general conversation. Beagel was eventually handcuffed, and transported to the trooper's station. After she was handcuffed, Beagel asked Zabala questions concerning bail. He told her that she would be taken to a magistrate who would set bail. She then made the following remark:

God, David used to work here, State Troopers ... I didn't, I didn't do it on purpose ... I didn't kill him ... I didn't shoot him, do you know what I mean. He better not be dead. We're going on vacation. He's gotta be alright. I'm already mad at him for even bringing the gun out.

When they arrived at trooper headquarters, Beagel was placed in an interview room while a search warrant was obtained for her blood and urine samples, fingerprints, palm prints, and photographs. Zabala sat silently in this room with Beagel. Beagel continued to make statements which were recorded. Trooper Gaylan then entered the room. Beagel asked him questions concerning her right to get an attorney. Gaylan again advised her of her rights, including her right to appointed counsel. Gaylan did not question Beagel about the shooting.

Zabala then returned to the interview room to stay with Beagel while they awaited the search warrant. They talked generally about living in Kansas, their backgrounds and living experiences. Beagel made several incriminating comments during this discussion, including a statement that she pointed the gun at him.

A grand jury indicted Beagel for murder in the first degree. Her case proceeded to trial. At trial, the state asserted that Beagel shot her husband in the head. In support of this theory, the prosecution presented the evidence of her statements to 911 and to the troopers. In addition, the state presented expert testimony to the effect that suicide victims do not usually shoot themselves in the forehead; they shoot themselves either in the side of the head or in the mouth. The other physical evidence which the state relied upon was that no powder burns were found on David Beagel's forehead at the time of the autopsy; this was consistent with a wound caused by a gun being fired at least eighteen inches away.

The defense theory at trial was that David Beagel died as the result of a self-inflicted bullet wound. On the evening of August 20, 1989, the Beagels were arguing about having children and Lesley's visit to a medical doctor in connection with her inability to become pregnant. During the course of the argument, David became volatile and hysterical. David brought out a gun. He held the gun out, away from himself, and shouted that Lesley should kill him. He yelled at Lesley, "Do it, just do it, do it and get it over with." Lesley testified that she remembered reaching her hands out, and all of the sudden the gun went off. She then saw that David had been shot. Lesley remembered calling 911, and having a "bunch of people" arrive at the house, and the next thing she remembered was "waking up" at the Sixth Avenue jail.

The defense argued that the absence of powder burns on David's forehead was inconclusive on whether he committed suicide. The absence of powder burns was only discovered at the time of the autopsy, and David had already been hospitalized for twenty-four hours. During that twenty-four hour period, the hospital staff cleaned the wound and would have wiped away traces of gun shot residue. In addition, a portion of skin around the wound was removed for pathological examination; this portion of skin was lost. Finally, the state's expert testified that the gun shot wound could have been self-inflicted.

At trial, the defense attempted to introduce psychiatric testimony that Beagel's incriminating remarks were the result of hysteria and confabulation caused by psychogenic amnesia, and therefore were not inconsistent with the theory of suicide. Dr. Aron Wolf, a psychiatrist, would have testified that,

> [T]he leap from her hearing, 'Kill me, kill me,' to—to being asked, 'Who did it,' and then putting together the fact, 'I must have done it,' and then answering, 'I did it,' was the confabulatory leap, or potentially confabulatory leap.

However, the trial court refused to admit this testimony into evidence. At the conclusion of the evidence a jury convicted Beagel of manslaughter.

Beagel first contends that Superior Court Judge Karl S. Johnstone erred in failing to suppress statements which Beagel made to the police. Prior to trial, Beagel asked the court to suppress all the statements which she made to the police after her telephone call.[1] Judge Johnstone found that until the time when Beagel was given *Miranda*[2] warnings, she was not in custody. In making this finding, Judge Johnstone emphasized the fact that Beagel was in her own house, that there was no showing of force by the officers, and that the officers were responding to an emergency call concerning a potential homicide. Judge Johnstone ruled that the police had a right to be in the house and to ask certain preliminary questions. Furthermore, Judge Johnstone found that the statements which Beagel made after being warned of her *Miranda* rights were spontaneous and were not the result of any questioning or subtle interrogation techniques.

■ In reviewing a trial court's denial of a motion to suppress evidence, this court must review the record in the light most favorable to upholding the trial court's ruling. *Stumbaugh v. State*, 599 P.2d 166, 172 (Alaska 1979). Factual determinations which form the basis for the trial court's ruling will be reversed only if found to be clearly erroneous. *Chilton v. State*, 611 P.2d 53, 55 (Alaska 1980). Factual findings are clearly erroneous when there is no substantial evidence to support them. *Ahkivgak v. State*, 730 P.2d 168, 171 (Alaska App.1986). As to matters involving the accused's state of mind and the issue of voluntariness, this court will examine the entire record and make an independent determination. *Ridgely v. State*, 705 P.2d 924, 931, *rev'd*, 732 P.2d 550, *on remand*, 739 P.2d 1299 (Alaska App.1987).

**1.** Beagel did not contest the admissibility of her telephone call statements at trial, and does not raise this issue on appeal.

**2.** *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

■ In order for a person's *Miranda* rights to be triggered, the statements must be the product of both custody and interrogation. Because we conclude that Beagel's statements were not the product of police interrogation, we need not reach the issue of whether Beagel was in custody.

In *Rhode Island v. Innis*, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980), the Supreme Court defined "interrogation" for purposes of *Miranda*. The Court noted that interrogation reflects "a measure of compulsion above and beyond that inherent in custody itself." *Id.* at 300, 100 S.Ct. at 1689 (footnote omitted.). The court concluded that *Miranda* safeguards are activated "whenever a person in custody is subjected to either express questioning or its functional equivalent." *Id.* The "functional equivalent" of questioning refers to

> words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police.

*Id.* at 300–01, 100 S.Ct. at 1689–90 (footnotes omitted). The definition of interrogation extends only to words or actions which officers "should have known" were reasonably likely to elicit a response. *Id.* at 302, 100 S.Ct. at 1690. Any knowledge which the police have of an "unusual susceptibility" of the defendant is taken into account in determining whether they should have known their actions would elicit a response. *Id.* at 302 n. 8, 100 S.Ct. at 1690 n. 8.

Beagel initially argues that the police questioning of her qualifies as "express questioning." Beagel gives the following examples of "express" questions which the police asked her: "What's your husband's name, ma'am?"; "Date of birth?"; "How much have you had to drink?"; "Couple of beers?"; "More than six?"; "What kind?"; "Have you taken any drugs or anything like that?"; "Do you have any kids?". The state contends that these questions fall under the exception provided for "on the

scene questioning," and thus are permitted under *Miranda*.

■ In *Innis*, the Court exempted from the definition of interrogation words or actions of the police which are "normally attendant to arrest and custody." *Innis*, 446 U.S. at 301, 100 S.Ct. at 1689. In *State v. Salit*, 613 P.2d 245, 257 (Alaska 1980) (*quoting Miranda*, 384 U.S. at 477–78, 86 S.Ct. at 1629–30), the supreme court noted that "[g]eneral on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process" does not qualify as interrogation. In addition, interrogation is defined as questioning which is likely to elicit an incriminating statement. *Id.*

In this case, the questions which were posed to Beagel were general questions concerning the facts of the crime. The police needed to identify her husband. Beagel was hysterical, and questions concerning her drug intake may have been helpful for determining her mental state. Beagel responded to these questions with non-responsive self-incriminating statements. However, these were general questions which in and of themselves do not appear to be designed to elicit incriminating responses. Therefore, the police asked Beagel general on-the-scene questions which do not qualify as interrogation.

■ Beagel next argues that the police questioning qualifies as the functional equivalent of interrogation. *Innis*, 446 U.S. at 300, 100 S.Ct. at 1689; *See also Svedlund v. Anchorage*, 671 P.2d 378, 381 n. 4 (Alaska App.1983). Beagel argues that the officers created an atmosphere that was expected to elicit incriminating responses from her. The officers apparently created this atmosphere by isolating her from her husband, limiting the information she received concerning him, not allowing her to call her parents, and sitting close by her in her bedroom with tape recorder in hand. Moreover, Beagel argues that she was particularly susceptible to interrogation because she was obviously hysterical, and therefore, the officers should have known that their questions would elicit in-

criminating responses. *See Innis*, 446 U.S. at 302 n. 8, 100 S.Ct. at 1690 n. 8.

Contrary to Beagel's assertion, the facts of this case do not indicate an attempt by the officers to create an atmosphere "carefully gauged and reasonably likely to elicit incriminating statements." Beagel was kept away from her husband so that she would not interfere with the paramedics or the investigation. There was no evidence presented that the officers knew any information about her husband's well-being which they were not telling her. The police did prevent Beagel from using the phone to call her parents, however, Zabala testified that he tried numerous times to place the call for her. Therefore, the actions and words of the officers in this case do not qualify as the "functional equivalent" of interrogation.

Therefore, the statements which Beagel made to the officers prior to the time she was arrested were not the product of interrogation, and thus were not violative of her *Miranda* rights.

■ Beagel argues that, after Zabala formally arrested her and she invoked her rights, questioning continued. Beagel contends that this questioning was violative of her rights because, after she requested an attorney, all questioning should have ceased. *Ladd v. State*, 568 P.2d 960, 966–67 (Alaska 1977), *cert. denied*, 435 U.S. 928, 98 S.Ct. 1498, 55 L.Ed.2d 524 (1978).

The only question which Beagel was asked after she invoked her rights was whether she had any children. This question is justified as on-the-scene questioning. Apparently, there were "nintendo-type games" in the house, so that Zabala thought the Beagels might have children. Because David Beagel was dying, and he had just arrested Lesley Beagel, it was rational for Zabala to make sure there were no children who needed attention. This was not a question which was designed to elicit an incriminating response.

Beagel also contends that her rights were violated when Selden came into the room and asked her if she had been told her rights. Selden testified that in fact he knew she had been told her rights, but did

not know that she had invoked them. Because he knew that she had already been informed of her rights, Selden's motives in asking Beagel if she had been told her rights are questionable. However, he was interrupted in his conversation with Beagel by Zabala, who told Selden that Beagel had already invoked her rights. Selden never questioned Beagel.

There was no questioning of Beagel after she invoked her rights. Conversations which occurred after that time were initiated by her, and she continued to make unsolicited incriminating remarks. Therefore, after invoking her rights, Beagel was not interrogated in violation of *Miranda*.

■ We conclude that Judge Johnstone could properly find that the statements which Beagel made to the police were not the product of police interrogation. In any event, to the extent that one or more of the statements by the police officers could constitute interrogation, admission of Beagel's responses would constitute harmless error. *Chapman v. California*, 386 U.S. 18, 23, 87 S.Ct. 824, 827, 17 L.Ed.2d 705 (1967). Taken as a whole, Beagel's statements were consistent and were volunteered to the police irrespective of any police action. We find no error.

■ Beagel next contends that Judge Johnstone erred in refusing to admit the testimony of Dr. Aron Wolf, a psychiatrist. Prior to trial, Wolf evaluated Beagel and prepared a report of this evaluation. In an extensive analysis, Wolf concluded that Beagel's statements claiming responsibility for the shooting were a product of psychogenic amnesia and confabulation. His report stated:

Mr. Beagel was trying to force Mrs. Beagel to take the gun. He evidently repeated this in an insistent, screaming voice over and over again. She states that she was terribly frightened by his actions. It is extremely conceivable that because Mr. Beagel was attempting to force the gun on Mrs. Beagel and that he indeed was then shot, and that she has no memory for 36 hours after the incident, that what she put together in this

state were his words to the effect that she should shoot him. Thus the fact that he was shot got transposed in the 911 call to the statement that she shot him. She was told to shoot him and he was shot and in this shock-like state, she verbalized it to the authorities that she shot him.... Her whole world was falling apart and given those kind of circumstances, it simply would not be unusual for her to have a fugue state in which she didn't remember and in which she would have responded in a way that almost made sense to her. There is a similar mental process in people who have amnesias because of old age or because of a substance intake of substantial nature called confabulation. In those cases, these people's brains are not functioning entirely, but they try and put together facts in a pseudo plausible way. In this fugue state, I believe this is exactly what Mrs. Beagel did at the times that she was recorded on the tapes.

The state moved to preclude Dr. Wolf's testimony on several grounds, and an evidentiary hearing was held outside the presence of the jury. During this hearing, Wolf amplified on his written evaluation of Beagel. In defining "confabulation" and "fugue" states, Wolf read from the glossary of a treatise, the *Comprehensive Textbook of Psychology*, which he testified was a reliable authority in this field. He also presented definitions of psychogenic fugue states from DSMR–III, a diagnostic and statistical manual which he testified was an authoritative treatise in the field. Wolf also testified that based upon David Beagel's past medical and psychiatric evaluations, he concluded that Beagel was more likely to commit suicide than the average person.

At the conclusion of the hearing, Judge Johnstone ruled that Wolf's testimony would not be admissible. In rejecting admitting the testimony, Judge Johnstone stated that the testimony was confusing to him and would be equally helpful to the defendant and the state. He concluded that the testimony would confuse the jury and that the probative value of the testimony was outweighed by its potential preju-

dicial effect. Judge Johnstone stated that Beagel had not shown that Wolf's testimony was based on generally accepted principles in the field of psychiatry. *Pulakis v. State*, 476 P.2d 474, 478 (Alaska 1970) (adopting *Frye v. United States*, 293 F. 1013 (D.C.Cir.1923)). He also concluded that Wolf's testimony was based on misinformation and was based upon hypnotically induced statements which would not otherwise be admissible. Judge Johnstone also ruled that Wolf's opinion that Beagel was more likely to commit suicide than an average person was merely a common sense conclusion which would not aid the jury.

Alaska Rule of Evidence 702(a) states:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

■ A trial court has "considerable latitude" in determining whether an expert witness can testify. *New v. State*, 714 P.2d 378, 380 (Alaska App.1986). We are to reverse the decision of the trial court only where we are convinced that the trial court has abused its discretion. *Id.*

In the case at bar, we are convinced that the trial court abused its discretion in refusing to admit the testimony. Dr. Wolf's testimony, if believed by the jury, was critically important to Beagel's defense. Wolf's testimony purported to explain why Beagel might make false statements indicating that she had shot her husband.

In *Handley v. State*, 615 P.2d 627 (Alaska 1980), the trial court excluded testimony from an expert witness in a murder case. The expert witness would have testified that the defendant had acted while he was in an alcoholic blackout which deprived him of the ability to premeditate, deliberate, or form an intent to kill. *Id.* at 629. The supreme court reversed. The court pointed out that the expert's testimony "was the key to Handley's defense of diminished ca-

pacity." *Id.* at 630. In ruling against the state, the court stated

> The state makes much of the fact that [the expert's] opinion on the effect of alcoholic blackout reflected a "novel theory" not shown to have gained general acceptance among psychologists and psychiatrists. This objection goes to the weight rather than the admissibility of such evidence. Expert testimony based on the same theory has been admitted in other cases in Alaska.

*Id.* at 630 n. 9 (citations omitted).

In this case, it is uncontested that Dr. Wolf was a qualified psychiatrist. He testified that his opinion was based on a standard diagnosis which was contained in the *Comprehensive Textbook of Psychology* and the DSMR–III, which are reliable psychiatric authorities. Wolf's testimony established at least a *prima facie* case that his testimony was based on principles which had gained general acceptance in the field of psychiatry.

> Alaska Rule of Evidence 703 provides: The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. Facts or data need not be admissible in evidence, but must be of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject.

■ It is common for psychiatrists to rely on hearsay reports. Alaska Rule of Evidence 703 allows psychiatrists to base their opinions upon evidence that they generally rely upon in making a diagnosis. *See* Alaska Rule of Evidence and commentary. Under the rule it appears that Wolf could rely on hypnotically-induced testimony to the extent that psychiatrists generally rely on such information to arrive at a diagnosis. In any event, Wolf did not place critical reliance on the hypnotically induced statements of Lesley Beagel. According to his testimony, he relied on those statements mostly to confirm his diagnosis of Beagel's lack of memory of the incident; the hypnotically induced statements did not form the foundation for his ultimate opinion.

■ Judge Johnstone relied on the fact that Wolf stated that he believed that David's fingerprints were on the gun in excluding Wolf's opinion. As a matter of fact, the police did not find any fingerprints on the gun. However, Wolf testified that the misinformation concerning David's fingerprints did not change his overall opinion that Mrs. Beagel was in an altered mental state. Under these circumstances, Wolf's original reliance on the erroneous fact that David's fingerprints were on the gun did not constitute a sufficient reason to exclude his testimony.

■ We similarly conclude that Judge Johnstone erred in refusing to let Dr. Wolf testify that David was more likely to commit suicide than an average person. Wolf's opinion was an expert opinion which was based upon his examination of David's medical history and upon his expert knowledge concerning people who commit suicide.

■ We conclude that Wolf's specialized knowledge was the kind of knowledge which the defense was entitled to present on this issue. We conclude that admission of Wolf's expert testimony was critical to Beagel's defense, particularly Wolf's explanation of Beagel's statements. We therefore conclude that the error in excluding Wolf's testimony was not harmless, and that Beagel is entitled to a new trial.

■ Beagel next contends that Judge Johnstone erred in excluding photographs of Beagel's hands. Beagel sought to admit the photographs, which were allegedly taken at the time of her arrest, to show that she did not have gunshot residue, gunshot stippling, or powder burns on her hands. Beagel wished to introduce these photographs to support her contention that she did not fire the weapon which killed her husband. However, the record shows that Officer Zabala, the witness through whom Beagel attempted to introduce the photo-

 

graphs, was not sure when the photographs were taken. Judge Johnstone sustained an objection to the admission of the photographs, subject to Beagel establishing a proper foundation for admission of the photographs at a later time. We conclude that Judge Johnstone did not abuse his discretion in requiring Beagel to show with more specificity when the photographs were actually taken.

The conviction is REVERSED.

MANNHEIMER, J., not participating.