**Raymond CARR, Appellant,**

v.

**STATE of Alaska, Appellee.**

**No. A–4040.**

Court of Appeals of Alaska.

Oct. 16, 1992.

On Petition for Rehearing
Nov. 5, 1992.

Susan M. Carney, Asst. Public Defender, Fairbanks, and John B. Salemi, Public Defender, Anchorage, for appellant.

Kenneth M. Rosenstein, Asst. Atty. Gen., Office of Special Prosecutions and Appeals, Anchorage, and Charles E. Cole, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., and COATS and MANNHEIMER, JJ.

BRYNER, Chief Judge.

Raymond Carr was convicted by a jury of three counts of sexual abuse of a minor in the first degree. AS 11.41.434(a)(1). Carr appeals, contending that Superior Court Judge Niesje J. Steinkruger erred in failing to suppress certain statements obtained from him in violation of his privilege against self-incrimination and his right to counsel. U.S. Const., amend. V, VI; Alaska Const., art. I, §§ 9, 11. We affirm.

Carr and Sandra Y. lived together for many years and had two children, K.Y. and T.Y. Sandra Y. also had a daughter, S.Y., from a previous relationship. Sometime in 1988, Carr and Sandra Y. were imprisoned for unrelated crimes—Carr for assault and sale of simulated controlled substances; Sandra Y. for forgery. Because Carr and Sandra Y. were incarcerated, the state placed K.Y., T.Y., and S.Y. in foster care and filed child-in-need-of-aid (CINA) proceedings to obtain formal custody of them. As the father of K.Y. and T.Y., Carr was a party to the CINA case. Carr's attorney in his assault and controlled substance cases assisted Carr in maintaining contact with his two children and was eventually appointed to represent Carr in the CINA case.

In February of 1990, while the CINA case was still pending, S.Y. reported to one of her foster parents that Carr had sexually abused her on numerous occasions between approximately July 1987 and July 1988 (when S.Y. was six and seven years old). S.Y. repeated her accusations to a physician and to various counselors; the matter was ultimately referred to Alaska State Trooper Daniel Hickman.

When Hickman received this information, Carr was incarcerated at the Fairbanks Correctional Center and Sandra Y. was at the Hiland Mountain Correctional Facility. Hickman contacted Sandra Y. and persuaded her to cooperate in obtaining information from Carr concerning the reported abuse. On March 15, Sandra made a telephone call to Carr, which Hickman monitored electronically.[1] During the call, Carr admitted sexually abusing S.Y. The next day, Hickman met with Carr; after advising Carr of his *Miranda* rights, Hickman interviewed him and elicited further incriminating statements.

Prior to trial, Carr moved to suppress his March 15 statement to Sandra Y. and his March 16 statement to Hickman. As to the March 15 statement, Carr contended that, because he was incarcerated and because Sandra Y. was acting on behalf of the

---

1. Hickman had secured a warrant in accordance with the requirements of *State v. Glass,* 583 P.2d 872, 875 (Alaska 1978).

troopers, her telephone conversation with him amounted to custodial interrogation and should therefore have been preceded by a *Miranda* warning. Alternatively, Carr claimed that, since he was represented by counsel in the pending CINA case, Sandra Y.'s trooper-instigated telephone call to him amounted to a violation of his right to counsel. Carr similarly claimed a violation of his right to counsel as a result of Hickman's interview with him the next day, March 16. Superior Court Judge Niesje J. Steinkruger denied Carr's motion, and Carr's incriminating statements of March 15 and 16 were thereafter introduced against him at trial.[2]

■ On appeal, Carr reasserts his self-incrimination and right-to-counsel claims. We first consider Carr's self-incrimination claim. "[A] necessary element of compulsory self-incrimination is some kind of compulsion." *Hoffa v. United States*, 385 U.S. 293, 304, 87 S.Ct. 408, 414, 17 L.Ed.2d 374 (1966). In *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the United States Supreme Court recognized such compulsion to be inherent in the coercive setting that exists when the police conduct a custodial interrogation.

It is undisputed that Sandra Y. placed her telephone call to Carr at the behest of the troopers and that her conversation with Carr was calculated to elicit incriminating statements from him. Thus, for purposes of this decision, we may assume that Carr's incriminating statements resulted from police interrogation. *See, e.g., Rhode Island v. Innis*, 446 U.S. 291, 301–302, 100 S.Ct. 1682, 1690, 64 L.Ed.2d 297 (1980); *Beagel v. State*, 813 P.2d 699, 706 (Alaska App. 1991). The precise issue here is whether this interrogation was custodial, that is, whether it occurred under circumstances amounting to *Miranda* custody.

■ Just as compulsory self-incrimination presupposes "some kind of compulsion," *Hoffa*, 385 U.S. at 304, 87 S.Ct. at

414, "custody," for *Miranda* purposes, presupposes at least some minimal element of coerciveness. We have said that *Miranda* custody "exists when there are 'inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely.'" *State v. Murray*, 796 P.2d 849, 850 (Alaska App.1990) (quoting *Miranda*, 384 U.S. at 467, 86 S.Ct. at 1624). The standard for determining *Miranda* custody is objective: *Miranda* warnings are required for police interrogation conducted under circumstances in which a "reasonable person would feel he was not free to leave and break off the questioning." *Hunter v. State*, 590 P.2d 888, 895 (Alaska 1979).

■ No single factor is determinative when this standard is applied; rather, the standard demands consideration of the totality of the circumstances in each case. *Quick v. State*, 599 P.2d 712, 717 (Alaska 1979); *State v. Murray*, 796 P.2d at 850. Accordingly, it is broadly recognized that incarceration, in and of itself, will not automatically trigger the *Miranda*-warning requirement. *See, e.g., United States v. Willoughby*, 860 F.2d 15, 23–24 (2nd Cir.1988); *Cervantes v. Walker*, 589 F.2d 424, 428 (9th Cir.1978); *People v. Williams*, 44 Cal.3d 1127, 245 Cal.Rptr. 635, 644–45, 751 P.2d 901, 910 (1988). *See generally Kochutin v. State*, 813 P.2d 298, 309 & n. 2 (Alaska App.1991) (Bryner, C.J., dissenting). As the United States Supreme Court emphasized recently in *Illinois v. Perkins*, 496 U.S. 292, 297, 110 S.Ct. 2394, 2397, 110 L.Ed.2d 243 (1990), "the premise of *Miranda*" is the need to eliminate "the danger of coercion result[ing] from the interaction of custody and official interrogation." Even when a suspect is incarcerated, unique circumstances may arise in which there is no reasonable possibility that coercive interaction of this kind might occur; such circumstances will preclude a finding of *Miranda* custody:

**2.** On March 17, 1988, Carr's court-appointed counsel left a message with Hickman's office instructing the troopers to refrain from any further contact with Carr. Carr thereafter called Hickman; in response, Hickman interviewed Carr on two further occasions. Judge Steinkruger granted Carr's motion to suppress statements made by Carr after his attorney contacted the troopers; those statements are not at issue here.

When the suspect has no reason to think that the listeners have official power over him, it should not be assumed that his words are motivated by the reaction he expects from his listeners.

*Id.*

The "official interrogation" in the present case involved neither formal questioning nor a personal confrontation with a law enforcement officer; instead, it consisted of the March 15 telephone call that Carr received from his girlfriend, Sandra Y. Nothing concerning the nature or timing of the call appears to have been unusual. Carr was evidently entitled to receive or reject telephone calls from outside the Fairbanks Correctional Center. The record contains nothing to indicate that he was under any degree of compulsion in electing to accept Sandra Y.'s call or that he was in any way inhibited from terminating the call after accepting it. Moreover, since Carr was unaware that Sandra Y. was calling at the behest of the troopers, he had "no reason to think that ... [she might] have official power over him." *Id.*

Furthermore, although Carr was incarcerated when Sandra Y. called him, he was not being held as the suspect of a crime or on pending, unresolved charges. Rather, he was serving a sentence for a wholly unrelated crime. Given *Miranda*'s underlying rationale, these circumstances are highly significant:

> When a person is confined in custody solely as a sentenced prisoner, with no charges pending, the issue of guilt resolved by a final verdict, and the terms and conditions of confinement clearly defined in a written judgment that is a matter of public record, the anxiety and uncertainty that support *Miranda*'s finding of inherent coercion simply cease to exist.

*Kochutin v. State,* 813 P.2d at 309 (Bryner, C.J., dissenting).

In short, in light of the totality of the circumstances surrounding Carr's telephone conversation with Sandra Y., it seems virtually inconceivable that Carr's incriminating statements were in any realistic sense the product of "coercion res.ult[ing] from the interaction of custody and official interrogation." [3] *Illinois v. Perkins,* 292 U.S. at 297, 110 S.Ct. at 2397.

Carr nevertheless argues that *Tarnef v. State,* 512 P.2d 923 (Alaska 1973), is controlling and that, under that case, Sandra Y. was required to give him *Miranda* warnings. However, the facts in *Tarnef* are readily distinguishable. There, Timlin, a professional arson investigator with a police background, interrogated Tarnef, an arson suspect who was evidently in jail awaiting disposition on other charges. Timlin was working closely with the police and had promised to furnish them with any information Tarnef provided. The police arranged for Timlin to gain access to Tarnef in jail in order to interrogate him. When Timlin met with Tarnef, Tarnef was aware of Timlin's role in the investigation; Tarnef had already been questioned concerning the arson by other persons, including a former district attorney and the victim of the crime. In moving to suppress, Tarnef claimed that he had been assured that he would not be prosecuted if he cooperated.

Given the factual circumstances in *Tarnef,* a finding of *Miranda* custody seems fully justified: a reasonable person in Tarnef's position may well have felt that he was not free to terminate the contact with Timlin. Moreover, the issue of *Miranda* custody does not appear to have been disputed in *Tarnef.* The precise question considered by the court was not whether Tarnef was in custody for *Miranda* purposes

---

3. Carr suggests that the use of deception by Sandra Y. deprived him of his right to due process under article I, section 7 of the Alaska Constitution. However, deceptive tactics are not *per se* impermissible under Alaska law and will violate due process only when they are coercive or tend to produce an untruthful confession. *Sovalik v. State,* 612 P.2d 1003, 1007 (Alaska 1980); *Marcy v. State,* 823 P.2d 660, 665 (Alaska App.1991). Here, nothing that Sandra Y. said to Carr during their telephone conversation appears to have been calculated to take advantage of or exploit Carr's position as a sentenced prisoner. Given the lack of coercion and the absence of any tendency to produce an untruthful confession, the deceptive tactics used by the state did not run afoul of the Alaska Constitution.

but rather whether Timlin acted as a private citizen or as a police agent. *See Tarnef*, 512 P.2d at 934.

We conclude that the superior court did not err in finding that Carr was not in *Miranda* custody when he spoke with Sandra Y. and that he need not have been informed by her of his *Miranda* rights.[4]

■ We next consider Carr's claim that Sandra Y.'s telephone call of March 15 and Trooper Hickman's interview of March 16 violated Carr's right to counsel. Article I, section 11 of the Alaska Constitution guarantees that "[i]n all criminal prosecutions, the accused shall have the right … to have the assistance of counsel for his defense." By its own terms, this constitutional right applies only when persons are "accused" in "criminal prosecutions." For this reason, the right to counsel is not triggered by purely investigative police efforts; before a person may claim the right, the state must take some type of formal adversary action, changing the person's status from that of a suspect to that of an "accused" in a criminal prosecution. *Thiel v. State*, 762 P.2d 478, 482–83 (Alaska App. 1988). At least in the absence of some form of "active incursion into or impairment of" an existing attorney-client relationship, no violation of the right to counsel can occur before the right has attached. *Id.* at 483.

■ Moreover, the right to counsel is case-specific: the fact that it has attached in a particular case does not entitle the accused to demand representation in connection with factually and legally unrelated matters in which the state has made no accusation and taken no adversary action. *See McLaughlin v. State*, 737 P.2d 1361, 1364 (Alaska App.1987). *See also Maine v. Moulton*, 474 U.S. 159, 180 & n. 16, 106 S.Ct. 477, 489 & n. 16, 88 L.Ed.2d 481 (1985).

■ In the present case, when Sandra Y. and Hickman spoke with Carr on March 15 and 16, the state was still in the early stages of investigating S.Y.'s report of sexual abuse. The state's efforts had been purely investigative; it had made no accusation and taken no formal adversary action against Carr in relation to the sexual abuse claim. Carr nevertheless points out that, when the March 15 and 16 contacts occurred, he was already a party in the CINA proceeding—a case in which the state was an adversary party and in which the court had appointed counsel to represent him. Carr asserts that a close relationship existed between the CINA proceeding and the child abuse investigation. According to Carr, the nexus between the already-existing CINA proceeding and the newly commenced criminal investigation entitled him to counsel for purposes of the criminal investigation and, in effect, extended the scope of his court-appointed counsel's duties beyond the CINA case, to include representation in the criminal investigation. Carr reasons that, by allowing Sandra Y. and Hickman speak with him on March 15 and 16 without notice to or approval of Carr's attorney, the state interfered with his established attorney-client relationship and violated his constitutional right to counsel.

In our view, however, the CINA proceeding and the sexual abuse investigation were not sufficiently related to vest Carr with the right to counsel in the sexual abuse case. The inception of the CINA proceeding was wholly unrelated to S.Y.'s claim of sexual abuse by Carr. In fact, the CINA case was commenced well before

---

**4.** This conclusion is not inconsistent with our recent decision in *Kochutin v. State*, 813 P.2d 298 (Alaska App.1991). In *Kochutin* this court considered the rule of *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), which prohibits the police from reinitiating contact with a suspect who has invoked the *Miranda* right to silence during a custodial interrogation, as long as that suspect remains in continuous custody. Kochutin was a sentenced prisoner and was interviewed in jail after having previously invoked his *Miranda* right. The state conceded that Kochutin was in *Miranda* custody when he originally invoked his right to silence. In that context, we decided that, once Kochutin had validly invoked the *Miranda* right, his continued incarceration as a sentenced prisoner qualified as continuous custody for *Edwards* purposes. We did not hold that all sentenced prisoners are *ipso facto* in *Miranda* custody.

S.Y. had made any claim of abuse; it was filed by the state in order to obtain custody over the children of Carr and Sandra Y. because both Carr and Sandra Y. were incarcerated and unable to care for their children.

Furthermore, S.Y.'s claim of abuse did not arise in the context of the custody proceedings; rather, she simply told her foster mother that Carr had molested her. At no time relevant to his case were S.Y.'s accusations incorporated into or litigated in the CINA case.

Finally, Carr's participation as a party in the CINA case was wholly unrelated to S.Y.'s participation in the case or to the issue of S.Y.'s custody. Carr was a party to the CINA case only because he was the father of K.Y. and T.Y. Carr was not related to S.Y., who was Sandra Y.'s daughter by a prior relationship. Thus, Carr had no actual or legal claim to assert in the CINA proceeding with regard to the issue of S.Y.'s custody. To the extent that an adverse relationship existed between the state and Carr in the CINA case, that relationship had no connection to S.Y.

S.Y.'s claim of sexual abuse was certainly not irrelevant to the pending CINA case. Because it reflected on Carr's fitness to act as a parent, S.Y.'s accusation, if borne out by the criminal investigation, could have had a significant impact on Carr's custody rights with respect to his own children, K.Y. and T.Y. In denying Carr's motion to suppress, Judge Steinkruger expressly recognized this factual relationship between the criminal investigation and the CINA proceeding but concluded that it was insufficient to trigger Carr's right to counsel with respect to the sexual abuse case. We agree with Judge Steinkruger's conclusion. If the state had attempted to introduce Carr's statements to Sandra Y. or Hickman as evidence in the CINA case, Carr could plausibly have objected on the ground that the statements had been obtained in violation of his right to counsel in that case. We need not decide the issue here. The relevant inquiry for present purposes is not what potential impact the criminal investigation might have had on the pending cus-tody case—in which Carr's right to counsel had already attached—but rather the extent to which the custody action was related to the newly commenced criminal investigation.

As we have already indicated, the constitutional right to counsel is not triggered by purely investigative efforts, since such efforts do not render a suspect "the accused" in a "criminal prosecution." Alaska Const. art. I, § 11. Thus, the state's investigation of S.Y.'s report of sexual abuse did not, in itself, entitle Carr to representation in connection with the allegation. Furthermore, in the specific factual setting of this case, the existence of the CINA proceedings did not, in any real sense, have the effect of converting Carr's status in the criminal investigation from that of a suspect to that of an "accused" in a criminal proceeding.

For this reason, we find the relationship of the CINA case to the criminal investigation too tenuous to support the conclusion that Carr's right to counsel in connection with the criminal investigation had already attached when he spoke with Sandra Y. and Hickman. The state's failure to give prior notice of these contacts to Carr's CINA counsel did not violate Carr's right to counsel in the criminal case.

 Carr's final contention is that the trial court erred in excluding evidence of Sandra Y.'s dishonesty. This claim lacks merit. At trial, Carr attempted to impeach Sandra Y.'s testimony by establishing that she was a dishonest person. To this end, Carr proposed to call Superior Court Judge Richard D. Savell, who had presided over Sandra Y.'s forgery trial. In sentencing Sandra Y., Judge Savell had expressed the view: "Miss [Y.], you're a thief, you're a crook and you can't be believed." Carr offered to have Judge Savell testify to similar effect at trial. After hearing Judge Savell's proposed testimony out of the presence of the jury, however, Judge Steinkruger determined it to be more prejudicial than probative and excluded it. *See* A.R.E. 403.

Alaska Rule of Evidence 608 regulates the use of character evidence to impeach witness credibility. The rule provides, in

relevant part, that "[t]he credibility of a witness may be attacked ... by evidence in the form of opinion or reputation," but only if such evidence refers "to character for truthfulness or untruthfulness[.]" A.R.E. 608(a). Except in limited circumstances irrelevant to the present case, A.R.E. 608(b) expressly bars admission of evidence of specific instances of untruthfulness.

■■■ Here, although Carr ostensibly sought to present opinion evidence as to Sandra Y.'s dishonest character, Judge Savell, responding to questioning by Carr out of the presence of the jury, repeatedly testified that the only opinion he held was that Sandra Y. had been dishonest in the forgery case and that she "couldn't be believed in the matters then before me." This is plainly not an opinion as to Sandra Y.'s "character for ... untruthfulness," A.R.E. 608(a), but is rather an opinion that Sandra Y. actually conducted herself dishonestly on one specific occasion. Though offered as "opinion" evidence, Judge Savell's proposed testimony was tantamount to evidence of a specific instance of dishonesty and, as such, was inadmissible under A.R.E. 608(b).[5]

For these reasons, we AFFIRM Carr's conviction.

## ON PETITION FOR REHEARING

In our opinion affirming Carr's conviction, we concluded, in part, that "it seems virtually inconceivable that Carr's incriminating statements were in any realistic sense the product of 'coercion result[ing] from the interaction of custody and official interrogation.'" See, pp. 1004–05. In reaching this conclusion, we mentioned, among other circumstances, that "Nothing concerning the nature or timing of the call [Carr received from Sandra Y.] appears to have been unusual. Carr was evidently entitled to receive or reject telephone calls from outside the Fairbanks Correctional Center." *Id.* at 1004.

■■■ On rehearing, Carr challenges the accuracy of this statement, citing passages from the trial court record to indicate that "The Alaska State Troopers made special arrangements for Sandra Y[.] to be able to call Mr. Carr." The cited passages, however, establish only that the Troopers intervened to enable Sandra Y. to place a call she might not otherwise have been allowed. They neither suggest nor establish any intervention by the Troopers altering the nature or circumstances of Carr's custody, or otherwise taking advantage of his incarceration to gain any potentially coercive advantage.

For these reasons, the petition for rehearing is DENIED.

---

**5.** Even assuming Judge Savell's testimony outside the presence of the jury indicated that he had an opinion as to Sandra Y.'s character for dishonesty rather than an opinion that she was dishonest on the occasion when she appeared before him, Judge Steinkruger did not abuse her discretion in ruling the evidence more prejudicial than probative and excluding it under A.R.E. 403. If viewed as evidence relating to Sandra Y.'s character for dishonesty, Judge Savell's opinion would at best be minimally probative, since the opinion was plainly based on a single event—Sandra Y.'s trial—occurring under circumstances in which Sandra Y. obviously had compelling reasons to distort the truth in her own favor.