**Roger V. THIEL, Appellant,**

v.

**STATE of Alaska, Appellee.**

**No. A–2063.**

Court of Appeals of Alaska.

Oct. 14, 1988.

John M. Murtagh, Anchorage, for appellant.

Cynthia M. Hora, Asst. Atty. Gen., Office of Sp. Prosecutions and Appeals, Anchorage, and Grace Berg Schaible, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., SINGLETON, J., and HUNT, Superior Court Judge.*

## OPINION

BRYNER, Chief Judge.

Roger V. Thiel was charged by indictment with one count of robbery in the first degree and two counts of attempted murder. Thiel was convicted, following a jury trial, of the robbery charge and of two counts of assault in the third degree, a lesser-included offense of attempted murder. On appeal, Thiel asserts that the superior court erred in denying Thiel's pretrial suppression motions. Thiel also challenges the admission of expert testimony at trial and contends that the trial court erred in refusing to find that the crime of hindering prosecution in the first degree was a lesser-included offense of robbery in the first degree. Finally, Thiel argues that the

* Sitting by assignment made pursuant to article IV, section 16 of the Alaska Constitution.

court erred in failing to allow him credit for time served while on release to a third-party custodian prior to trial. We affirm.

## FACTS

In the early morning hours of Halloween, 1985, two men wearing masks entered an Anchorage supermarket and demanded money at gunpoint. A third man, armed with a rifle, stationed himself as a lookout outside the back of the store.

Police officers arrived while the robbery was still in progress. The man stationed outside the store fled on foot after directing two bursts of gunfire toward the police. The two men inside the store ran out the back. After a brief exchange of fire, one of the men, John Hennessey, was shot and killed. The second, Sidney DeGross, was captured shortly thereafter.

DeGross did not cooperate with the police after being captured. The identity of the third man, who had acted as a lookout, thus remained undetermined. Officers who followed the path taken by the third man discovered footprints that he had left in the snow and made casts of several of the prints.

During the day following the robbery, police suspicion focused on two friends of Hennessey and DeGross: John Walker and Roger Thiel. On the evening of October 31, an officer spotted Thiel and Walker as they drove up to Thiel's residence. When the two men emerged from their car in Thiel's driveway, the officer approached them with his weapon drawn and performed a patdown search for weapons. He then asked if they would be willing to accompany him to the police station for an interview concerning the robbery. Both Thiel and Walker declined.

Thiel, in particular, told the officer that he was remaining silent on advice of counsel. Thiel's father, who appeared during the confrontation, informed the officer that Thiel was represented by an attorney and gave the officer the attorney's name.

On the following day, John Walker contacted the police. He acknowledged being involved in prior robberies with DeGross, Hennessey, and Thiel, but told the police that it was Thiel who had acted as the lookout in the Halloween supermarket robbery. Walker agreed to cooperate with the police in obtaining additional evidence against Thiel.

With Walker's cooperation, the police applied for and were issued a warrant authorizing them to monitor and record conversations between Walker and Thiel. The warrant initially authorized seizure of conversations occurring between November 1 and November 8, 1985; it was later extended through November 13. Pursuant to the warrant, the police recorded a number of conversations in which Thiel spoke to Walker about his involvement in the October 31 robbery.

On November 8, 1985, Walker told the police that Thiel had placed the rifle that he used in the robbery on top of a storage trailer adjacent to his house. Acting on this information, two police officers flew over Thiel's house in a small airplane. The rifle was not there, but one of the officers was able to see what he believed to be the imprint that it had left in the snow on top of the trailer.

A search for the rifle was subsequently conducted in the areas surrounding Thiel's residence and his place of employment. The gun was never found, but a pair of discarded running shoes were discovered beside the roadway near the entrance to Thiel's place of employment. The soles of the shoes matched the photographs and casts of footprints that had been left by the fleeing robber at the scene of the Halloween robbery.

As a result of his participation in the Halloween robbery, charges of robbery and attempted murder were filed against Thiel. Prior to trial, Thiel moved to suppress evidence on three separate grounds. Thiel asserted that his constitutional right to counsel was violated by the state's use of John Walker as an informant to elicit incriminating statements from him after he had expressly declined to speak with the police. Thiel also challenged the validity of the warrant authorizing electronic monitoring of his conversations with Walker. Fi-

nally, Thiel contended that the police violated his constitutional rights to privacy and to be free of unreasonable searches and seizures by conducting warrantless aerial surveillance of his property. Following a hearing, Superior Court Judge Karl S. Johnstone denied Thiel's motions to suppress.

Thiel was eventually tried by a jury, with Superior Court Judge S.J. Buckalew, Jr., presiding. In the course of trial, Thiel objected to the introduction of expert testimony tending to establish that Thiel had worn the discarded running shoes found near his place of employment. At the conclusion of the case, Thiel requested the trial court to instruct the jury that it could consider the crime of hindering prosecution in the first degree as a lesser-included offense of robbery in the first degree. Judge Buckalew declined to give Thiel's proposed instruction. The jury found Thiel guilty of the robbery charge; it acquitted him of the two attempted murder charges but convicted on the lesser-included offenses of assault in the third degree.

## SUPPRESSION ISSUES

### A. Right to Counsel

Thiel contends that the use of John Walker to initiate surreptitiously monitored conversations violated Thiel's constitutional right to counsel. Specifically, Thiel asserts that, once he was initially contacted by the police and expressly invoked his rights to counsel and to remain silent, the police were barred from any further effort to elicit incriminating statements from him.

Thiel acknowledges that this claim is foreclosed as a matter of federal constitutional law. Applying the sixth amendment to the United States Constitution, the United States Supreme Court has consistently held that the right to counsel attaches only upon the commencement of adversary criminal proceedings. See, e.g., Moran v. Burbine, 475 U.S. 412, 429–30, 106 S.Ct. 1135, 1145–46, 89 L.Ed.2d 410 (1986); Maine v. Moulton, 474 U.S. 159, 170, 106 S.Ct. 477, 484, 88 L.Ed.2d 481 (1985); Kirby v. Illinois, 406 U.S. 682, 688, 92 S.Ct. 1877, 1881, 32 L.Ed.2d 411 (1972). Because the right

to counsel does not attach during the purely investigative stages of a case, Moulton, 474 U.S. at 180 n. 16, 106 S.Ct. at 490 n. 16, the Court has found that the sixth amendment bars the use of informants to obtain incriminating statements from the accused only when the accused has invoked the right to counsel after the adversary proceedings have already been commenced. See Moulton, 474 U.S. at 180, 106 S.Ct. at 490; United States v. Henry, 447 U.S. 264, 269–70, 100 S.Ct. 2183, 2186, 65 L.Ed.2d 115 (1980); and Massiah v. United States, 377 U.S. 201, 205–206, 84 S.Ct. 1199, 1202–03, 12 L.Ed.2d 246 (1964).

■ In the present case, the police enlisted John Walker to engage in surreptitiously monitored conversations with Thiel after Thiel had expressly told them that he was represented by counsel. Nevertheless, no adversary proceedings had been commenced against Thiel when the monitored conversations occurred. While suspicion had undoubtedly focused on Thiel, the case against him clearly remained in an investigative posture and had not reached a formal adversarial stage. Under like circumstances, federal courts have uniformly refused to find police-initiated informant contacts to be violative of the sixth amendment's guarantee of the right to counsel. See, e.g., United States v. Reynolds, 762 F.2d 489, 493, (6th Cir.1985); United States v. Mitlo, 714 F.2d 294, 296 (3rd Cir.1983); United States v. Fitterer, 710 F.2d 1328, 1333 (8th Cir.1983); United States v. Kenny, 645 F.2d 1323, 1338 (9th Cir.1981); United States v. Nashawaty, 571 F.2d 71, 75 (1st Cir.1978); and United States v. Craig, 573 F.2d 455, 474–75 (7th Cir.1977).

Thiel nevertheless urges us to construe his right to counsel under the Alaska Constitution more broadly than the federal courts have construed the parallel protections of the sixth amendment. Article I, section 11 of the Alaska Constitution provides that, "In all criminal prosecutions, the accused shall have the right ... to have the assistance of counsel for his defense." Thiel urges us to hold that this provision bars police-initiated contact between an informant and a person who, like himself, is

the focus of a criminal investigation and who expressly invokes the right to counsel upon being subjected to an investigative stop.

In our view, however, Thiel misapprehends the fundamental purpose of our constitution's guarantee of the right to counsel. Article I, section 11 of the Alaska Constitution does not purport to guarantee the right to counsel in the abstract. Rather, it assures this important right to those who stand accused in "criminal prosecutions." By its own express terms, the constitutional guarantee of counsel finds root in the inception of a formalized adversary relationship between the state and an individual—some formal action by which the government places itself in an accusatory posture against a citizen.

In this respect, the similarity in language between the Alaska and United States Constitutions is significant. Both expressly hinge the guarantee of counsel on the existence of "criminal proceedings." Construing the sixth amendment to the United States Constitution, the United States Supreme Court has stated:

> [T]he suggestion that the existence of an attorney-client relationship itself triggers the protections of the Sixth Amendment misconceives the underlying purposes of the right to counsel. The Sixth Amendment's intended function is not to wrap a protective cloak around the attorney-client relationship for its own sake any more than it is to protect a suspect from the consequences of his own candor. Its purpose, rather, is to assure that in any "criminal prosecution," the accused shall not be left to his own devices in facing the "prosecutorial forces of organized society." By its very terms, it becomes applicable only when the government's role shifts from investigation to accusation. For it is only then that the assistance of one versed in the "intricacies ... of law" is needed to assure that the prosecution's case encounters "the crucible of meaningful adversarial testing."

*Moran v. Burbine*, 475 U.S. at 430, 106 S.Ct. at 1146 (citations omitted).

In urging this court to construe the Alaska Constitution broadly and to apply it to the circumstances of this case, Thiel points to numerous Alaska cases that have read article I, section 7, of the Alaska Constitution to afford greater protection to individuals than is afforded under the sixth amendment of the United States Constitution. In *Roberts v. State*, 458 P.2d 340 (Alaska 1969), our supreme court extended the right to counsel to a prisoner from whom the police sought to obtain a post-indictment handwriting examplar. The court in *Alexander v. Anchorage*, 490 P.2d 910 (Alaska 1971), extended the right to counsel to all criminal prosecutions involving the possibility of incarceration.

*Otton v. Zaborac*, 525 P.2d 537 (Alaska 1974), further extended the right to counsel by holding it applicable to civil contempt proceedings involving failure to make child support payments. The court held in *Blue v. State*, 558 P.2d 636 (Alaska 1977), that a defendant who was subjected to a pre-indictment lineup while in custody was entitled to representation by counsel. In *Reynolds v. Kimmons*, 569 P.2d 799 (Alaska 1977), the supreme court held that the right to counsel applied to a defendant in a paternity suit when the plaintiff was represented by the state. *Flores v. Flores*, 598 P.2d 893 (Alaska 1979), conferred the right to counsel upon a parent in a child custody proceeding when the opposing parent was represented by publicly sponsored counsel.

Unlike Thiel's case, however, these cases all involve some form of adversarial proceeding. In each case, the commencement of a specified adversarial proceeding was held to trigger the right to counsel. While each of these cases enlarges the scope of adversarial proceedings to which Alaska's constitutional guarantee of counsel attaches, none suggests that the need for some form of adversary proceeding can be dispensed with altogether or that Alaska's right to counsel attaches in the abstract to all attorney-client relationships.

To the contrary, in *Loveless v. State*, 592 P.2d 1206 (Alaska 1979), the Alaska Supreme Court expressly declined to construe the Alaska Constitution as extending to a

situation in which no adversary proceeding had yet been initiated:

> Although we are not limited to the scope of the sixth amendment when construing the right to counsel provided by our state constitution, when we have provided a broader right in the past we have done so only to protect the accused during proceedings that are investigatory in nature and which are conducted in an adversarial context.

*Id.* at 1210 (footnote omitted). *See also Eben v. State,* 599 P.2d 700, 706 (Alaska 1979); *Padgett v. State,* 590 P.2d 432, 436 (Alaska 1979); *McLaughlin v. State,* 737 P.2d 1361 (Alaska App.1987). Thiel has failed to cite any cases suggesting that the right to counsel guaranteed in the Alaska Constitution should be held to apply to purely investigative efforts by state officials. Nor has Thiel advanced any persuasive reasons for departing from the views articulated by the Alaska Supreme Court in *Loveless v. State.*

The police conduct that Thiel challenges in the present case involved no actual interference with Thiel's efforts to retain and consult with counsel, nor was there any active incursion into or impairment of the attorney-client relationship that Thiel had established. While police conduct involving such actual interference might well raise serious issues of fundamental fairness, those issues are not presented by the facts of this case. Here, we find that the use of John Walker to make contact with Thiel for purposes of eliciting incriminating statements did not amount to a violation of Thiel's right to counsel under the Alaska Constitution.

## B. *Validity of Glass Warrant*

Thiel next challenges the warrant that authorized electronic surveillance of his conversations with informant John Walker. Issued pursuant to *State v. Glass,* 583 P.2d 872 (Alaska 1978), the challenged warrant initially allowed the police to monitor and record all conversations between Walker and Thiel occurring from November 1 through November 8, 1985; it was subsequently extended through November 13.

Police recorded numerous conversations pursuant to the warrant. Portions of three separate conversations were admitted against Thiel over his objection at trial.

■ Thiel argues that all but the first of the surreptitiously recorded conversations must be suppressed because a *Glass* warrant cannot properly authorize the seizure of more than a single conversation. Thiel reasons that a *Glass* warrant is fully executed when the first conversation is seized and that additional conversations can therefore be seized only upon the issuance of further warrants.

This argument is without merit. In *Jones v. State,* 646 P.2d 243 (Alaska App. 1982), we emphasized the unique nature of *Glass* warrants and the consequent need for a pragmatic approach to their issuance and implementation. The limited purpose of a *Glass* warrant is to authorize electronic recording of conversations in which one of the participants has consented to the recording. Because *Glass* warrants deal with conversations that have not yet occurred, they are inherently anticipatory. They are frequently used in connection with ongoing criminal activities or investigations, in which multiple conversations are expected to occur.

When a conventional search warrant authorizing the seizure of tangible objects is executed, the seizure of the object exhausts the purpose of the warrant. In contrast, when one of a series of anticipated conversations occurs and is recorded pursuant to a *Glass* warrant, the execution of the warrant does not, in any practical sense, mean that the purpose of the warrant has been fulfilled.

■ When multiple conversations are expected, there is thus little reason to restrict *Glass* warrants to a single conversation. Ample protection against abuse of *Glass* warrants can be provided by enforcement of the fundamental requirement of probable cause. As long as there is probable cause at the time the warrant is issued to believe that more than one conversation will occur, and provided that the warrant itself is reasonably specific as to the time frame, the subject matter, the setting, and

the participants to be involved in the conversations, there is no bar to the issuance of a warrant authorizing the police to record multiple conversations within the specified time period.

In the present case, it is undisputed that the challenged warrant expressly authorized the police to record all conversations between Walker and Thiel occurring between November 1 and 13. The warrant specifically identified the participants to be recorded and was restricted to a reasonable time frame. Thiel has not alleged that the warrant was insufficiently specific in any other particular or that there was no probable cause, when the warrant was issued, to believe that Walker would engage Thiel in more than one conversation within the prescribed time period.

Under the circumstances, we conclude that the superior court did not err in upholding the warrant.

### C. Aerial Surveillance

Thiel argues additionally that the police violated his right to be free of unreasonable searches and seizures and his right to privacy by flying over his residence in search of the rifle that he used during the commission of the supermarket robbery. According to Thiel, evidence stemming from the aerial surveillance must be suppressed because the state failed to establish that the search was conducted from navigable air space. See, e.g., Dow Chemical Company v. United States, 476 U.S. 227, 106 S.Ct. 1819, 90 L.Ed.2d 226 (1986); California v. Ciraolo, 476 U.S. 207, 106 S.Ct. 1809, 90 L.Ed.2d 210 (1986). See also Chilton v. State, 611 P.2d 53, 56 (Alaska 1980). Thiel argues, alternatively, that the Alaska Constitution should be construed to prevent any warrantless aerial surveillance of private property. See People v. Cook, 41 Cal.3d 373, 221 Cal.Rptr. 499, 710 P.2d 299 (1985).

■ We find it unnecessary to reach the constitutional claims asserted by Thiel, because we conclude that, even if error occurred below, that error was harmless beyond a reasonable doubt. The only evidence that the police obtained as a result of

the challenged fly-over was their observation of an impression apparently left by a rifle in the snow atop a storage trailer next to Thiel's residence. Other evidence was presented at trial to establish Thiel's possession of a rifle after the Halloween robbery. The rifle itself was never found. Specifically, in a conversation that occurred after the aerial surveillance, Thiel told Walker that the rifle he had used in the robbery was no longer on his property and had been hidden. A recording of this conversation was admitted against Thiel at trial. Other admissions that Thiel made to Walker were even more incriminating and were also admitted against him at trial. Moreover, the running shoes found near Thiel's place of employment were positively linked to the scene of the robbery, and Thiel was, in turn, linked to the shoes.

In the context of the overwhelming evidence of guilt presented against Thiel at trial, the revelation that the police had observed an imprint of a rifle in the snow near Thiel's residence was at most inconsequential.

### EXPERT TESTIMONY—FORENSIC FOOT MORPHOLOGY

Thiel argues next that the trial court erred in allowing FBI agent William Bodziak to testify as an expert on "forensic foot morphology." Bodziak had compared casts of the footprints found near the scene of the Halloween robbery with the running shoes found near Thiel's place of employment. He testified that the running shoes matched the impressions left at the robbery scene.

Bodziak also examined the insoles of the running shoes and compared the wear pattern on the insoles to x-rays and impressions of Thiel's feet. Over Thiel's objection, Bodziak testified that the running shoes had been worn by Thiel or by someone with identical foot morphology.

■ On appeal, Thiel challenges Bodziak's identification of Thiel as the person who had worn the discarded running shoes. He contends that an insufficient foundation was laid below to establish that forensic

foot morphology is a generally accepted scientific discipline. Thiel relies on the standard established in *Frye v. United States*, 293 F. 1013, 1014 (D.C.Cir.1923), which has been adopted by the Alaska Supreme Court. *See Contreras v. State*, 718 P.2d 129 (Alaska 1986). Under *Frye*, before an expert is allowed to express an opinion based on a novel scientific theory or technique, the proponent of the testimony must establish that the novel theory or technique has "gained general acceptance in the particular field in which it belongs." *Frye*, 293 F. at 1014.

Thiel characterizes forensic foot morphology as an unproven field of expertise. He likens it to voice print analysis, which other courts have rejected as a technique that has not been generally accepted. *See, e.g., People v. Kelly*, 17 Cal.3d 24, 130 Cal.Rptr. 144, 549 P.2d 1240 (1976).

Our review of the record, however, convinces us that Thiel's argument is mistaken. Unlike voice print analysis, forensic foot morphology, as described by Bodziak, involves no novel scientific theory or technique. The techniques employed by Bodziak consisted of simple physical comparison between prominent features of Thiel's feet and wear patterns on the insoles of the discarded running shoes.

Although the comparison of insole wear patterns and foot morphology may be a relatively rare field of expertise, the underlying technique of physical comparison is neither novel nor unaccepted. Evidence of comparisons similar to those made by Bodziak in the present case has been uniformly accepted, where proffered. *See, e.g., United States v. Ferri*, 778 F.2d 985 (3rd Cir. 1985); *People v. Knights*, 166 Cal.App.3d 46, 212 Cal.Rptr. 307, 311–12 (1985); *State v. Bullard*, 312 N.C. 129, 322 S.E.2d 370 (1984). *See also State v. Hasan*, 205 Conn. 485, 534 A.2d 877 (1987).

Thiel's argument might be more persuasive if, as Thiel contends, Bodziak had expressed the opinion that no one other than Thiel could have caused the wear pattern found in the discarded running shoes. That opinion would necessarily have assumed that foot morphology, like fingerprints, is unique to the individual. This assumption is arguably a scientific theory that has not been generally accepted.

Contrary to Thiel's claims, however, Bodziak did not express such an opinion. Rather, he testified that the running shoes had been worn by Thiel or by someone with foot morphology identical to Thiel's.

The jury heard descriptions of the physical comparisons upon which Bodziak based his conclusions. The running shoes and the exhibits relied on by Bodziak for his physical comparisons were admitted into evidence and were available to the jury during its deliberations. It was left for the jury to determine the weight and credibility to give to Bodziak's testimony and the likelihood that other individuals with feet similar to Thiel's might have worn the running shoes.

Under the circumstances, we find no abuse of discretion in the trial court's decision to admit Bodziak's testimony.

## LESSER–INCLUDED OFFENSE

■ Thiel contends that the trial court erred in refusing to instruct the jury that it could consider the crime of hindering prosecution in the first degree as a lesser-included offense of robbery in the first degree. Under AS 11.56.770, hindering prosecution in the first degree occurs when the accused "renders assistance to a person who has committed a crime punishable as a felony with intent to ... hinder the apprehension, prosecution, conviction, or punishment of that person...."

Thiel reasons that he might have been convicted of the lesser offense of hindering prosecution if the jury concluded that he was passively present at the scene of the robbery and did not intend to assist in its commission until after the arrival of the police.

Thiel is mistaken, however, in characterizing hindering prosecution as a lesser-included offense of robbery. Under Alaska Criminal Rule 31(c), a person may be found guilty of a lesser offense that is necessarily included in the offense charged. An offense is not necessarily included in the

offense charged unless, under the evidence presented at trial, it would have been impossible to commit the offense charged without also committing the lesser offense. *See State v. Minano,* 710 P.2d 1013, 1016 (Alaska 1985); *Elisovsky v. State,* 592 P.2d 1221, 1226 (Alaska 1979).

■ In the present case, Thiel was charged with first-degree robbery on the theory that he aided DeGross and Hennessey by acting as a lookout while they robbed a supermarket. Conviction on this theory would not be inconsistent with acquittal of hindering prosecution. Accomplice liability presupposes conduct occurring before or during the actual commission of an offense. To be convicted as an accomplice, one must, *inter alia,* perform an act in furtherance of the commission of an offense. *See* AS 11.16.110. In contrast, hindering prosecution applies to conduct occurring once an offense has already been committed. In this regard, the plain language of the hindering prosecution statute is supported by its commentary, which states, in relevant part:

Conduct which would give rise to liability as an accessory after the fact under existing law is classified as the crime of hindering prosecution under the Code. The degree of the crime is geared to the class of crime committed by the fugitive.

Commentary to AS 11.56.770, Senate Journal Supp. No. 47 at 86 (June 12, 1978). *See also* R. Perkins and R. Boyce *Criminal Law* 748–51 (3rd Ed.1982).

Because the police arrived, and Thiel fled, while the supermarket robbery was still in progress, the jury could have convicted Thiel as an accomplice without finding that he rendered assistance after the offense had already been completed. Hence, conviction of the charged offense would not have been inconsistent with acquittal of the purported lesser offense. While, under the circumstances of the case, robbery and hindering prosecution may have been related offenses, the latter offense was not necessarily included in the former. Consequently, the trial court did not err in refusing to give a lesser-included offense instruction on hindering prosecution. *Minano,* 710 P.2d at 1016.

CREDIT FOR TIME SERVED

■ Thiel lastly challenges his sentence, contending that the superior court erred in failing to allow him credit for time that he had spent on pretrial release. Prior to trial, Thiel was released on bail to the custody of an acquaintance, who was charged with the responsibility of supervising Thiel. While released, Thiel was required to remain with his acquaintance at a remote mining site that was apparently inaccessible except by air.

The remoteness of the mining site, however, is not a sufficient restriction to require the conclusion that Thiel's freedom of movement was "severely restrained" or that the conditions of his pretrial release were comparable to those of formal confinement. *Compare Lock v. State,* 609 P.2d 539, 546 (Alaska 1980) (credit given for time spent in a rehabilitation program which subjected defendant to "severe restraints on his freedom of movement") *with Ackermann v. State,* 716 P.2d 5, 6 (Alaska App.1986) (credit denied for time spent confined to a fishing boat at sea during pretrial release). We hold that the sentencing court was not clearly erroneous in denying Thiel credit for time served.

The conviction and sentence are AFFIRMED.

COATS, J., not participating.