STATE of Alaska, Petitioner,

v.

Antonio M. GARRISON, Respondent.

No. A–8851.

Court of Appeals of Alaska.

Feb. 3, 2006.

---

Kenneth M. Rosenstein, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and David W. Márquez, Attorney General, Juneau, for the Petitioner.

Andrew J. Lambert, Kalamarides & Lambert, Anchorage, for the Respondent.

Before: COATS, Chief Judge, and MANNHEIMER and STEWART, Judges.

## OPINION

STEWART, Judge.

During interviews with the police, Antonio M. Garrison admitted that he removed a handgun from the scene of a homicide but consistently denied that he had any responsibility for this homicide. The grand jury returned an indictment charging Garrison with several crimes: felon in possession of a concealable firearm (Garrison had a prior felony conviction); two counts of tampering with physical evidence; first-degree murder; first-degree robbery; first-degree theft; and first-degree vehicle theft.[1]

---

1. AS 11.61.200(a)(1); AS 11.56.610(a)(1) & (4); AS 11.41.100(a)(1); AS 11.41.500(a)(1); AS 11.46.120; AS 11.46.360(a)(1), respectively.

Garrison moved to suppress his statements to the police in which he admitted removing the handgun, claiming a violation of his constitutional rights. The superior court suppressed Garrison's statements, finding that the police rendered Garrison's statements involuntary when they threatened him with harsher treatment. The superior court also concluded that Garrison's right to counsel had attached and was violated.

Because no adversary proceedings had commenced when Garrison made his statements, the superior court erred in concluding that Garrison's right to counsel had attached and was violated. Furthermore, because the police did not subject Garrison to custodial interrogation when he made the disputed statements, the superior court erred in ruling that Garrison's Fifth Amendment right to counsel was violated.

Moreover, we conclude that the detectives' statements Garrison relied on to support his claim that the police threatened harsher treatment are not threatening statements under article I, section 9 of the Alaska Constitution. Even if we analyze the case assuming the statements are threatening as a matter of law, Garrison admitted that he removed the gun before the detectives made the statements that Garrison identifies as threats of harsher treatment. Thus, even if Garrison's will was overborne by the detectives later in the interview, Garrison had already made the damaging admissions before the police statements that Garrison relied on to claim that his admissions were involuntary. Finally, examining the totality of the circumstances, we conclude that Garrison's will was not overborne by the detectives' statements.

We conclude that the superior court erred in suppressing Garrison's admissions. Accordingly, we reverse the superior court's ruling and remand for further proceedings on the indictment.

### Background facts and proceedings

On November 1, 2000, Paul Clinton was found shot to death in his place of business. Anchorage Police Detective Donald Krohn first interviewed Garrison on November 2, after the police discovered that Garrison had done business with Clinton on the day of his death. Garrison was given full Miranda[2] warnings, and Garrison denied any involvement in the homicide. Detective Krohn contacted Garrison a second time on November 4 at Garrison's residence. Krohn did not give Garrison Miranda warnings at this second interview; Garrison again denied involvement in the homicide. On November 7, Garrison retained an attorney, Chad Holt.

On December 11, the detectives contacted Garrison to arrange for another interview; Garrison agreed. On December 12, Garrison met Detectives Krohn and Timothy Landeis but told the detectives that Holt advised him not to talk with the police. This was the first time the detectives learned that Garrison had retained an attorney.

Sometime later, Detective Landeis called Holt and left a message with specific questions he wanted to ask Garrison. Holt returned the call, leaving a message for Detective Landeis indicating that Garrison would not make any statements.

In January 2001, the police recovered a handgun that had been pawned by Garrison's sister. The police suspected that this gun might have been used to shoot Clinton. They had the gun tested. The testing showed that it was possible that the gun was the murder weapon, but the testing was not conclusive.

On January 18, 2001, Krohn and Detective Nick Vanderveur went to Garrison's house and were let in by his wife. The detectives did not give Garrison a Miranda warning before the interview started. The detectives told Garrison about the gun they retrieved from a pawnshop that his sister had pawned, and they told Garrison they had tested the gun (without telling him that the testing was not conclusive).

Garrison claimed that he had sold the gun to Clinton the day before Clinton was killed. Garrison said that he went to Clinton's office on November 1, discovered that he was dead, saw the gun lying near Clinton's body, and took the gun in a panic and left. Garrison

2. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

explained that he took the gun because he was on probation and did not want the gun linked to him. Garrison again denied killing Clinton.

The detectives told Garrison where they were in the investigation. They informed Garrison that they would present the case they had to the district attorney, and they told Garrison that the evidence appeared to support a case of intentional murder, unless Garrison had something more he wanted to share with them. Detective Krohn told Garrison: "[If][y]ou don't talk to us, you don't tell us the story[, then] we have [just the] one story." "And we go straight to the DA with it," Detective Vanderveur added. Detective Vanderveur then told Garrison "... we're out on a limb ... we don't always ... do this for people."

The detectives asked Garrison if he would agree to a polygraph examination. Garrison agreed and drove himself to the police station. Before the examination, Garrison waived his *Miranda* rights. After the polygraph, Garrison was interviewed again by Detectives Krohn and Landeis and then left the station.

The grand jury indicted Garrison on July 13, 2001, charging him with two counts of tampering with physical evidence and one count of felon in possession of a firearm, first-degree murder, first-degree robbery, first-degree theft, and first-degree vehicle theft. Garrison moved to suppress his January 18, 2001 statements, arguing he was in custody on January 18 and, therefore, should have been given a *Miranda* warning. He also argued that his statements on January 18 were involuntary under the Fifth Amendment and, because his right to counsel had attached and been violated, were taken in violation of the Sixth Amendment.

Superior Court Judge Michael L. Wolverton granted Garrison's motion. Judge Wolverton found that Garrison was not in custody at any point on January 18, 2001. Nevertheless, Judge Wolverton found that Detective Landeis knew Garrison had retained Holt as his attorney and knew that

Holt advised Garrison not to talk to police. Judge Wolverton further found that the detectives threatened Garrison with harsher punishment if he did not talk to them, thereby making his admissions of tampering with evidence and illegal possession of the gun involuntary. The State petitioned for review of Judge Wolverton's ruling on the motion to suppress, and we granted review.

*Because adversary criminal proceedings had not begun when Garrison admitted his criminal activity, Garrison's Sixth Amendment right to counsel had not attached*

The State argues that the superior court erred when it concluded that Garrison's Sixth Amendment right to counsel was violated on January 18. The State points out that in *Thiel v. State*,[3] we ruled that the right to counsel under the Sixth Amendment attaches "only upon the commencement of adversary criminal proceedings" and not during "purely investigative stages of a case."[4] The State asserts that adversary proceedings did not commence until July 13, 2001, the day Garrison was first formally charged by grand jury indictment. Accordingly, the State argues that Garrison's right to counsel had not yet attached on January 18, 2001. In addition, the State argues that the police's knowledge that Garrison had a lawyer and the lawyer told the police that Garrison did not wish to talk, did not bar the detectives from contacting and interviewing Garrison on January 18.

Garrison argues his right to counsel had attached at the January 18 interview. He maintains that his right to counsel is also guaranteed under article I, section 11 of the Alaska Constitution, which provides, in part, "In all criminal prosecutions, the accused shall have the right ... to have the assistance of counsel for his defense."

Garrison argues that Alaska case law suggests that the right to counsel attaches not only when adversary proceedings begin but also when police "actively interfere or impair [an existing] attorney-client relationship."

In *Thiel*, we held that article I, section 11 of the Alaska Constitution mirrored the Sixth

---

**3.** 762 P.2d 478 (Alaska App.1988).

**4.** *Id.* at 481.

Amendment of the U.S. Constitution in providing a right to counsel only in "criminal proceedings" where there is "commencement of a specified adversarial proceeding" that "trigger[s] the right to counsel." [5] We acknowledged that the scope of Alaska's constitutional protection had enlarged beyond the federal minimum, but we did not find that the "need for some form of adversary proceeding can be dispensed with altogether or that Alaska's right to counsel attaches in the abstract to all attorney-client relationships." [6] In *Thiel*, we relied on *Loveless v. State*,[7] a case in which the Alaska Supreme Court held that the right to counsel has been extended to investigatory proceedings but only when conducted in an "adversary context." [8]

Garrison asks this court to extend the right to counsel to situations where police interfere with an existing attorney-client relationship, even when no adversary proceeding has yet commenced. For support, Garrison cites *Blue v. State*,[9] *Thiel v. State*, and *Carr v. State*,[10] three cases that dealt with the right to counsel under the Alaska Constitution.

In *Blue*, the Alaska Supreme Court held that "a suspect who is in custody is entitled to have counsel present at a pre-indictment lineup unless exigent circumstances exist so that providing counsel would unduly interfere with a prompt and purposeful investigation." [11] *Blue* is not directly controlling here

because, unlike the defendant in *Blue* who was in custody during the police interview, Judge Wolverton found Garrison was not in custody during the January 18 interview at his home.

Our remarks in *Thiel* and *Carr* might be subject to broader interpretation. In *Thiel*, we declined to extend the right to counsel under the Alaska Constitution to instances where adversarial proceedings had not begun but noted that "police conduct involving ... actual interference [with an attorney-client relationship] might well raise serious issues of fundamental fairness...." [12] And in *Carr*, we announced that the right to counsel may be offended before formal charges in situations where the attorney-client relationship has been impaired.[13]

Objectively, the transcripts of the interviews do not show that the detectives actively discouraged Garrison from contacting Holt. The police even reminded Garrison of his right to an attorney and suggested that the attorney would likely repeat the advice not to discuss the case with the police. The record does not support a conclusion that the detectives improperly interfered with Garrison's attorney-client relationship.

We are not limited by the scope of the Sixth Amendment when we construe the right-to-counsel provision of the Alaska Con-

---

**5.** *Id.* at 482–83. *See also Eben v. State*, 599 P.2d 700, 706 (Alaska 1979) (quoting *Kirby v. Illinois*, 406 U.S. 682, 689, 92 S.Ct. 1877, 1882, 32 L.Ed.2d 411, 417 (1972)) ("Eben's sixth amendment rights were not implicated ... because no 'adversary judicial criminal proceedings whether by way of formal charge, preliminary hearing, indictment, information, or arraignment' had been initiated against him.").

**6.** *Thiel*, 762 P.2d at 482 (citing *Flores v. Flores*, 598 P.2d 893 (Alaska 1979) (conferring the right to counsel to a parent in a child custody case when the other parent was represented by state counsel); *Reynolds v. Kimmons*, 569 P.2d 799 (Alaska 1977) (conferring the right to counsel to a defendant in a paternity suit when the plaintiff was represented by state counsel); *Blue v. State*, 558 P.2d 636 (Alaska 1977) (finding a defendant subject to a pre-indictment lineup while in custody was entitled to representation); *Otton v. Zaborac*, 525 P.2d 537 (Alaska 1974) (extending the right to counsel to civil contempt proceedings involving failure to make child support pay-

ments); *Alexander v. Anchorage*, 490 P.2d 910 (Alaska 1971) (extending the right to counsel to all criminal prosecutions involving the possibility of incarceration); *Roberts v. State*, 458 P.2d 340 (Alaska 1969) (extending the right to counsel to a prisoner from whom the police sought to obtain a post-indictment handwriting exemplar)).

**7.** 592 P.2d 1206 (Alaska 1979).

**8.** *Id.* at 1210 (citing *Blue v. State*, 558 P.2d 636 (Alaska 1977); *Roberts v. State*, 458 P.2d 340 (Alaska 1969)).

**9.** 558 P.2d 636 (Alaska 1977).

**10.** 840 P.2d 1000 (Alaska App.1992).

**11.** *Blue*, 558 P.2d at 642 (citations omitted).

**12.** *Thiel*, 762 P.2d at 483.

**13.** *Carr*, 840 P.2d at 1005.

stitution.[14] But in *Thiel,* a case that parallels Garrison's situation, we concluded that right to counsel under article I, section 11 of the Alaska Constitution was coextensive with the right under the Sixth Amendment.[15]

Finally, Garrison urges this court to uphold Judge Wolverton by applying the holding of the New York Court of Appeals in *People v. Skinner*[16] to the facts of this case. *Skinner* announced a rule of law that, where "a defendant is known to have invoked the right to and obtained the services of counsel on the matter about which the person is questioned, the State may not use statements elicited from that person in the absence of a waiver of counsel made in the presence of the attorney." [17]

In *Skinner,* the defendant retained an attorney who instructed police not to question the defendant unless the attorney was present.[18] Almost two years later, police contacted the defendant and, after reading him *Miranda* warnings, conducted an interview in which the defendant made damaging admissions.[19] Even though no formal proceedings against the defendant had commenced, the New York Court of Appeals found that the defendant's right to counsel under the New York Constitution was violated: [20]

> In retaining an attorney specifically in response to repeated police-initiated contacts, [the] defendant unequivocally indicated that he felt himself unable to deal with the authorities without legal assistance. In a real sense, he had activated his constitutional right to interpose an attorney between himself and the overwhelming power of the State.... That right is rendered illusory if the State's agents are permitted to subject an individual represented by counsel to questioning in a noncustodial setting. The effects of a waiver of counsel are no less real in that setting; waiver of the right to counsel once invoked should be no less ineffective than when made by a person in custody.[21]

The holding in *Skinner* is based on New York's *Donovan–Arthur–Hobson* rule, which prohibits virtually all police interrogation once a defense attorney is retained, regardless of whether judicial proceedings have commenced.[22] In *People v. Hobson,*[23] the New York Court of Appeals defended this approach as a more robust constitutional protection against involuntary waiver of counsel, stating that the rule "breathes life into the requirement that a waiver of a constitutional right must be competent, intelligent and voluntary." [24] Further, the court found the rule served to "protect the individual, often ignorant and uneducated, and always in fear, when faced with the coercive police power of the State." [25] Professor Yale Kamisar has observed, however, that this rule actually favors the professional criminal, as it is this individual who is most likely to have already obtained counsel in advance of or during a police investigation.[26] Other jurisdictions that have been urged to follow *Skinner* have declined.[27]

**14.** *Blue,* 558 P.2d at 641. *See also Roberts v. State,* 458 P.2d 340, 342 (Alaska 1969) ("We are not bound in expounding the Alaska Constitution's Declaration of Rights by the decisions of the United States Supreme Court, past or future, which expound identical or closely similar provisions of the United States Constitution.").

**15.** *Thiel,* 762 P.2d at 482.

**16.** 52 N.Y.2d 24, 436 N.Y.S.2d 207, 417 N.E.2d 501 (1980).

**17.** *Skinner,* 436 N.Y.S.2d 207, 417 N.E.2d at 505.

**18.** *Id.* 436 N.Y.S.2d 207, 417 N.E.2d at 502.

**19.** *Id.*

**20.** *Id.* 436 N.Y.S.2d 207, 417 N.E.2d at 503.

**21.** *Id.* 436 N.Y.S.2d 207, 417 N.E.2d at 505.

**22.** Yale Kamisar, *Police Interrogations and Confessions* 213 (1980) (citing *People v. Hobson,* 39 N.Y.2d 479, 384 N.Y.S.2d 419, 348 N.E.2d 894 (1976); *People v. Arthur,* 22 N.Y.2d 325, 292 N.Y.S.2d 663, 239 N.E.2d 537 (1968); *People v. Donovan,* 13 N.Y.2d 148, 243 N.Y.S.2d 841, 193 N.E.2d 628 (1963)).

**23.** 39 N.Y.2d 479, 384 N.Y.S.2d 419, 348 N.E.2d 894 (1976).

**24.** *Id.* 384 N.Y.S.2d 419, 348 N.E.2d at 898.

**25.** *Id.*

**26.** Kamisar, *supra,* at 221.

**27.** *See State v. Luton,* 83 Hawai'i 443, 927 P.2d 844, 852 (1996); *State v. Scarborough,* 124 N.H. 363, 470 A.2d 909, 914 (1983); *State v. Smart,* 136 N.H. 639, 622 A.2d 1197, 1213 (1993); *Lara v. State,* 740 S.W.2d 823, 835 (Tex.App.1987).

■ We decline to follow the approach of the New York Court of Appeals in *Skinner.* Instead, we adhere to *Thiel.* Because Garrison had not been formally charged with a crime, we conclude that Garrison's right to counsel under either the Sixth Amendment or the Alaska Constitution had not attached when the police interviewed him on January 18. Therefore, the superior court erred when it concluded that the police interviews on January 18 violated Garrison's right to counsel either under the Sixth Amendment or article I, section 11 of the Alaska Constitution.

*Because Garrison was not subjected to custodial interrogation on January 18 at his home, his Fifth Amendment right to counsel was not violated*

Garrison argues that he made an equivocal reference to an attorney during the January 18 interview at his home when he said "the attorney freaks me out more than you do. All I did was get advice...." Garrison asserts that, at that point, the detectives were required to narrow the scope of their questioning to ascertaining whether or not Garrison was evoking his rights.

The State argues that Garrison's right to counsel under the Fifth Amendment was not violated because he was not in custody when he was questioned and, therefore, was not entitled to the protections required by *Miranda.*

In *Eben v. State,*[28] the Alaska Supreme Court announced that "[b]oth *custody and interrogation* must be involved in the procurement of an inculpatory statement by law enforcement officials before the standards enunciated in *Miranda* are applicable."[29]

Judge Wolverton found that Garrison was not in custody at any time on January 18. Garrison does not dispute this finding with regards to the interview conducted in his home. Because Garrison was not in custody at the time he was interviewed in his home, under *Eben,* he was not subjected to custodial interrogation. Therefore, his Fifth Amendment right to counsel, under *Miranda,* was not violated.[30]

■ In Alaska, police have a duty in some circumstances to narrow questioning to determine whether a suspect is invoking Fifth Amendment rights.[31] But this duty applies when the police subject a suspect to custodial interrogation, and we have already noted that Judge Wolverton found that Garrison was not in custody.[32]

To the extent that Garrison argues that the police had to stop and clarify Garrison's reference to an attorney, that argument has no merit because Garrison was not in custody, and the requirement, under *Edwards v. Arizona,*[33] that the police stop an interview when a defendant makes an equivocal request for counsel applies to custodial interrogations.[34]

■ Police are bound by the restrictions placed on them by the Fifth Amendment guarantee against self-incrimination when they conduct a custodial interrogation. Because Garrison was not in custody during the interview in his home and, therefore, not subject to a custodial interrogation, the superior court erred to the extent it found that Garrison's Fifth Amendment privilege against self-incrimination was violated.

**28.** 599 P.2d 700 (Alaska 1979).

**29.** *Id.* at 707 (emphasis in the original).

**30.** *See id.*

**31.** *See Hampel v. State,* 706 P.2d 1173, 1180 (Alaska App.1985) ("Whenever even an equivocal request for an attorney is made by a suspect during custodial interrogation, the scope of that interrogation is immediately narrowed to ... *clarifying that request* until it is clarified.") (emphasis in the original). *See also Giacomazzi v. State,* 633 P.2d 218, 222 (Alaska 1981) (finding

that officers may clarify whether a statement is a request for counsel or an invocation of the right to remain silent); *Davis v. U.S.,* 512 U.S. 452, 459, 114 S.Ct. 2350, 2355, 129 L.Ed.2d 362 (1994) (finding officers are not required to cease questioning immediately upon an ambiguous or equivocal reference to an attorney).

**32.** *See Hampel,* 706 P.2d at 1180.

**33.** 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981).

**34.** *Id.* at 484–85, 101 S.Ct. at 1884–85.

*The superior court erred in finding that the police threatened harsher treatment if Garrison did not speak to them about the crime*

■ The voluntary nature of a confession is a mixed question of fact and law.[35] In *Beavers v. State*,[36] the Alaska Supreme Court outlined a three-part inquiry for ascertaining the voluntariness of a confession: the appellate court will review the trial court's findings regarding the "external, phenomenological facts surrounding the confession" for clear error and then will determine independently the accused's mental state and the legal significance of that mental state after an examination of the entire record and the "totality of the circumstances surrounding the confession." [37]

In his motion to suppress, Garrison argued that the detectives induced statements from him during the January 18 interview at his home with offers of leniency, promising Garrison he would not be arrested that day regardless of what he told the detectives. In addition, Garrison asserts, the detectives implied Garrison should say he accidentally shot Clinton as the detectives thought "the D.A. would understand that . . ." and that it would be hard to "sell" the D.A. the "story" that Garrison was not involved in Clinton's murder. Garrison points out that the detectives used phrases such as "please tell me now. Don't make me come back later because if I have to come back later . . ." and "Please don't make me prove this [because] if they make me prove this it's gonna turn out a whole lot different than probably what it really was or what you think it was." Garrison further notes that Detective Krohn testified at the suppression hearing that the detectives were trying to get Garrison to talk by telling him it would be "worse" for him if he did not.

Garrison argues that, because his inculpatory statements were made in response to these statements, they were presumptively involuntary and should be suppressed. The State argues that nothing in the detectives' statements that Garrison relies on suggests Garrison would receive any punishment for refusing to talk to the detectives.

In *Beavers*, the Alaska Supreme Court held that "[t]hreat-induced confessions should be considered presumptively involuntary absent evidence affirmatively indicating that the suspect's will was not overcome by the threats." [38] The police told Beavers that he might be "hammered"—subjected to harsher treatment—during a non-custodial interview after which Beavers confessed to participation in a robbery.[39] The court concluded that Beavers' confession was involuntary because the interviewing troopers' threat that he would be "hammered" if he attempted to hide his involvement in the robberies "conveyed an unmistakable message that Beavers would be punished for exercising his constitutional right to silence." [40]

Here, Judge Wolverton found, relying on *Beavers*, that Garrison's admission that he moved the gun from the murder scene was presumptively involuntary because of threats of harsher treatment made by the detectives. Judge Wolverton ruled on the motion to suppress from the bench and did not specify which statements by the detectives he based his decision on.

An examination of the record shows that there are numerous instances during the January 18 interview where the detectives seemingly took a confrontational tone. For the purposes of determining whether Garrison's admissions were involuntary, however, the relevant statements to consider are those the detectives made before Garrison admitted that he removed the handgun from the scene of the homicide.[41]

---

35. *Beavers v. State*, 998 P.2d 1040, 1044 (Alaska 2000).

36. 998 P.2d 1040 (Alaska 2000).

37. *Id.* at 1044.

38. *Id.* at 1048.

39. *Id.* at 1042.

40. *Id.* at 1048.

41. *See id.* at 1046 (finding confessions *resulting* from threats are presumptively involuntary).

■ All of the detectives' statements Garrison referred to in the superior court and in this court were made after Garrison already admitted that he took the handgun. A finding that police threats provoked an involuntary confession logically requires a finding that the threats preceded the confession. Because Garrison's admissions occurred *before* the detectives made the statements Garrison identifies as threatening, the superior court erred in finding Garrison's statements were involuntary.

■ While Detective Krohn testified at the evidentiary hearing that he hoped to sway Garrison to talk during the January 18 interview, we review the objective events that occur in the interview. An officer's subjective aims do not control our analysis. Before Garrison's initial admissions, the detectives had only asked Garrison whether his family should leave the room for the interview and told Garrison the results of their continued investigation, including the fact that they had recovered a handgun pawned by his sister and subjected it to testing. Detective Krohn said "And I—what I'm asking you is to tell me what happened so that I can tell the district attorney. Otherwise, it looks like plain-out murder." Garrison then reaffirmed that he was not involved in Clinton's homicide but said that he discovered Clinton's body and took the gun that Garrison had sold him earlier. He claimed that he took the gun because he was on probation and did not want to be tied to the gun. From our review of the circumstances of the interview, we conclude that none of the detectives' statements before Garrison's admissions constituted threats of harsher treatment under *Beavers*. The detectives explained to Garrison that the evidence they had developed suggested that the homicide appeared to be murder and that, absent some mitigating information from Garrison, they would present the existing evidence they had to the district attorney. These statements do not suggest that Garrison would be subjected to harsher than normal treatment unless he admitted his involvement in the homicide.[42] Rather, the detectives offered Garrison a chance to provide additional information that might tend to exculpate him or mitigate his conduct.

■ We next consider Garrison's claim that the detectives' statements later in the interview were threatening. Viewed objectively, the statements do not tell Garrison that he would receive harsher treatment unless he admitted involvement in Clinton's homicide. Viewed in isolation, one of Detective Krohn's statements, made very close to the end of the interview at Garrison's home, could be described, arguably, as threatening: "Please don't make me prove this [because] if they make me prove this it's gonna turn out a whole lot different than probably what it really was or what you think it was. Now damn it, if this was an accident tell us now. Don't let me find out later it was murder for the money." But Krohn did not explicitly threaten any harsher treatment for Garrison if Garrison did not admit involvement in the homicide. And, viewed in the context of the detectives' other statements, it is a repetition, admittedly in stronger language, of the detectives' assertion that Garrison might be better served if he advanced exculpatory or mitigating information sooner. Viewing the interviews on the 18th collectively, we conclude that the detectives' statements are not threats under *Beavers*.

The State next argues that Garrison's statements were improperly suppressed because Garrison's will was not overborne.[43] The State asserts that Garrison's "unwavering adherence to his story effectively rebuts any presumption of coercion and establishes that the detectives did not overbear his free will." The State argues that Garrison was merely "engag[ing] in a calculated effort to assuage police suspicions and to make it appear that he was reluctantly but honestly cooperating with their investigative efforts."[44]

---

42. *See id.*

43. *See id.* 998 P.2d at 1048 ("Threat-induced confessions should be considered presumptively involuntary absent evidence affirmatively indicat-ing that the suspect's will was not overcome by the threats.").

44. *Edwards v. State,* 842 P.2d 1281, 1285 (Alaska App.1992).

■ The determination of whether a statement is involuntary "rests in large measure on the subjective effect of the police conduct on the suspect's will."[45] Statements may be deemed involuntary if officers, through threats, undermine a suspect's will to resist and elicit a confession that would otherwise not be freely given.[46] In *Edwards v. State*,[47] the suspect argued his statement to officers was involuntary because the police officers threatened him with immediate arrest on a murder charge if he failed to talk to them.[48] We found that, despite the threat, the statements were not involuntary: "The main impediment to such a finding [that the statements were involuntary] is that Edwards, despite police pressure to talk, said nothing to directly inculpate himself in [the crime]."[49] The holding in *Edwards* was affirmed in *Malloy v. State*,[50] where we again found the suspect's statement was voluntary, despite officer threats, primarily because the suspect said nothing to directly inculpate herself.[51]

Nevertheless, Judge Wolverton ruled that Garrison did make inculpatory statements: "I'm further persuaded ... that, contrary to *Edwards* and *Malloy*, the ultimate result was that Mr. Garrison admitted two felonies: [evidence] tampering and felon in possession." But Garrison consistently denied that he was responsible for Clinton's death—the focus of the investigation and the interviews. Even though his statements directly inculpated him in the offenses of tampering with evidence and felon in possession of a concealable firearm, the obvious purpose of these statements was to explain how Garrison's sister came to be in possession of the gun in a way that did not implicate Garrison in Clinton's death.

■ As we noted above, Garrison's admissions preceded any statements identified by Garrison as coercive or threatening.[52] The timing of Garrison's admissions, before any arguably threatening or coercive statements were made by the detectives, and the exculpatory nature of the admissions with respect to the homicide, establishes that Garrison's will was not overborne.[53]

The superior court erred in ruling that Garrison's statements were involuntary.

*Garrison's claim that he was in custody during the interviews at the police station*

At the suppression hearing, Judge Wolverton found that Garrison was not in custody at any time on January 18, 2001. Garrison challenges this finding as to the interviews at the Anchorage Police Department that followed the interview at his home.

But this contention appears to be moot because the police advised Garrison of his *Miranda* rights at the police station before the polygraph examination. The record shows that Garrison said that he understood his rights, and with those rights in mind, he waived his rights and agreed to talk with the police. Even if Judge Wolverton erred when he concluded that Garrison was not in custody, (and we are not convinced that this conclusion is erroneous) the police advised Garrison of his *Miranda* rights at the police station, and Garrison waived those rights.

*Conclusion*

We REVERSE the superior court's order granting Garrison's motion to suppress his statements. We remand the case to the superior court for further proceedings on the indictment.

**45.** *Id.* at 1285.

**46.** *Malloy v. State,* 1 P.3d 1266, 1276 (Alaska App.2000); *Edwards,* 842 P.2d at 1285.

**47.** 842 P.2d 1281 (Alaska App.1992).

**48.** *Id.* at 1285.

**49.** *Id.*

**50.** 1 P.3d 1266 (Alaska App.2000).

**51.** *Id.* at 1276.

**52.** *See id.* ("Statements are involuntary if the police, through promises or threats, undermine a suspect's will to resist and elicit a confession that is not freely given.").

**53.** *See Beavers,* 998 P.2d at 1048.