904 A.2d 808 (2006)
387 N.J. Super. 522
STATE of New Jersey, Plaintiff-Respondent,
v.
George KING, Jr., Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued December 20, 2005.
Decided August 18, 2006.
*810 Joseph E. Krakora, Assistant Public Defender, argued the cause for appellant (Yvonne Smith Segars, Public Defender, attorney; Mr. Krakora and Susan Remis Silver, Special Assistant to the Public Defender, on the brief).
Nancy A. Hulett, Assistant Prosecutor, argued the cause for respondent (Bruce J. Kaplan, Middlesex County Prosecutor, attorney; Ms. Hulett, of counsel and on the brief).
Before Judges SKILLMAN, AXELRAD and PAYNE.
The opinion of the court was delivered by
AXELRAD, J.T.C. (temporarily assigned).
We granted leave to appeal to both the State and defendant from an order pertaining to psychiatric testimony proffered by the defense. The expert testimony is offered by defendant to cast doubt on the reliability of his confession, which is the principal evidence in the State's case to prove defendant committed murder. The judge found the confession voluntary and admissible, and defendant did not seek leave to appeal on that issue.
The appeal concerns whether defendant's forensic psychiatrist should be permitted *811 to testify that defendant's narcissistic and antisocial personality disorders affected the confession's reliability. After conducting a hearing pursuant to N.J.R.E. 104, the court entered an order permitting Dr. Roger Harris to testify, as an expert in the field of forensic psychiatry, that "he diagnosed the defendant with certain psychiatric disorders, the characteristics of those disorders, and that defendant suffered from those disorders on [the date of his confession]," and that "defendant's psychiatric disorders are consistent with the defendant's claim of false confession or are . . . associated with false confessions."[1] The court, however, restricted Dr. Harris from testifying "as to anything the defendant or anyone else told him about the circumstances surrounding the giving of the confession. . . ."
The State seeks total exclusion of the psychiatric evidence. Defendant seeks admission of the proffered testimony without the restrictions imposed by the trial judge. We affirm on the State's appeal. On defendant's appeal, we affirm in part and reverse in part.

I
Defendant George King was charged with the murder of Meifang Rush at the Woodbridge Mall, which occurred on January 8, 2003. Rush was apparently abducted near her car and strangled to death. The police had no suspects in their murder investigation until March 2003.
On March 13, 2003, at about 11:00 p.m., defendant was arrested and brought to the Newark police station for questioning on the homicide of Edna Ryan. Detective Michael DeMaio of the Newark Police Department and Investigator Nicole Berrian of the Essex County Prosecutor's Office began questioning defendant at about 3:15 a.m. and, within an hour, defendant had confessed to Ryan's murder.[2]
Almost immediately after the Ryan statement was taken, defendant stated, "I might as well tell you about Woodbridge." When Detective DeMaio asked what he meant, defendant referred to the murder of a girl at a mall in Woodbridge, prompting the Newark police to contact the Woodbridge Police Department.
Detective Edward Galinis of the Woodbridge Police Department and Investigator Kevin Morton of the Middlesex County Prosecutor's Office arrived at the Newark Police Department at about 6:30 a.m. They conducted a pre-interview of defendant, advised him of his Miranda[3] rights, and took a formal taped statement of defendant beginning at about 9:00 a.m., in which he confessed to the murder of Rush at the Woodbridge Mall.
Defendant claims his confession to the Rush homicide is false. He also claims that during the March 14, 2003 interrogation he falsely confessed or attempted to confess to a number of other murders. Defendant did not testify at the pre-trial hearing. Testimony at the hearing disclosed that during defendant's interrogations *812 with both the Essex County and Middlesex County detectives and investigators, defendant talked about other unsolved crimes in addition to the Ryan and Rush murders. The extent to which he discussed other crimes, and whether he confessed to other murders, is disputed. Defendant claimed he was "involved" in or had "knowledge" or "information" about the crimes. The State insists that defendant confessed to no other crimes.
During the Ryan questioning, Newark detective DeMaio asked defendant if he knew anything about a girl's body that had been found behind a Popeye's Restaurant, which was close to the Ryan murder site. Defendant said, "I don't really want to talk about that. You know [that] I will." According to the detective, defendant did not confess to the murder and only provided details that were in the newspaper, so the discussion was not pursued further. It was subsequently learned that defendant was incarcerated in North Carolina at the time of the Popeye's homicide. Defendant also said that he stabbed a Puerto Rican man in the Down Neck section of Newark. The department checked to confirm the report of the stabbing but could find no such report.
According to the Middlesex County investigators, while discussing the Rush matter, there were times defendant would "go off on tangents" and start discussing other incidents and they "just let him talk." According to Detective Galinis, defendant indicated he had "information" about the Popeye's homicide and about a 1995 or 1996 homicide of a drug dealer named "Apu" in Elizabeth. The detective was certain that defendant never mentioned during the interview that he killed anyone other than Rush.
Investigator Morton testified that defendant mentioned something about a stabbing in Down Neck in Newark or by Popeye's Chicken and another crime. According to the investigator, defendant volunteered information about his "involvement" in the Popeye's crime; the investigator characterized the claimed involvement as having knowledge of the crime but did not remember any claim by defendant that he perpetrated the crime. Investigator Morton further testified about a follow-up meeting with Detective DeMaio and Investigator Berrian in which he explained they "were looking into whether [defendant], in fact, could have [committed the Popeye's crime]" and they told him defendant was incarcerated at the time.
Edward Gordon, a former Essex County Assistant Prosecutor assigned to the homicide squad, who was not present during defendant's interrogation, testified as to a vague recollection about the Newark police contacting local authorities down south in response to a claim by defendant that he committed a homicide there.[4] He also testified he learned that defendant claimed to have committed a homicide at Popeye's or McDonald's in Newark and was going to be charged with the killing until it was determined he was incarcerated at the time and could not have committed the crime. Gordon had previously conveyed this information to defense counsel in "casual conversation" unrelated to the investigation. He jokingly commented at the time that he could have closed out all of his homicides with defendant.
The defense retained Dr. Harris to assess defendant's claim of false confession in the context of his longstanding history of mental illness. Dr. Harris performed clinical evaluations of defendant on June 27, 2003 and October 29, 2004, during *813 which defendant informed him he had confessed to a variety of other crimes during the interrogation process. He also reviewed defendant's extensive medical and psychiatric history, information about the interrogation (including a letter from defense counsel detailing the conversation with Gordon) and defendant's taped and written confession to Rush's murder.[5] Drawing on his training and experience as a forensic psychiatrist, Dr. Harris diagnosed defendant's personality disorders, particularly his narcissistic personality disorder, and opined that the symptoms of the disorders made defendant vulnerable to giving the police false confessions. His report concluded, in pertinent part:
Mr. King reported he felt important and wanted to impress and help the police. He reported that he felt that they treated him specially and that they respected him. He felt that they worked as a team.
Mr. King's personality problems made him vulnerable during the interrogation. His need for admiration, special treatment and his grandiosity were able to be used very effectively against him allowing him to confess to one unsolved crime after another.
While it is not necessary to have a psychiatric illness to be susceptible to an interrogation, Mr. King's emotional problems made him particularly vulnerable.
. . . .
It appears that Mr. King was at great risk to supply the investigators with many of the confessions that they wanted. It appears that he gave a number of false confessions. It is my opinion, Mr. King's report that he falsely confessed is consistent with his psychiatric disorders described above.
The State moved to bar the defense expert from testifying about defendant's personality disorders, claiming it was not relevant and not admissible because the expert failed to provide a scientific basis specifically linking the disorder to the making of a false confession.
At the pre-trial hearing, Dr. Harris testified that defendant has had forty to fifty psychiatric hospitalizations since the age of nine. Dr. Harris diagnosed the thirty-two-year-old defendant as suffering from a longstanding Axis II narcissistic and antisocial personality disorder with characteristics of a borderline personality disorder at the time of the interrogation. He opined that these personality disorders affected defendant's conduct during the interrogation.
Dr. Harris explained the characteristics and diagnostic criteria of the personality disorders as defined by the Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR), a recognized authority published by the American Psychiatric Association. More particularly, he explained that Axis II personality disorders are enduring illnesses, and are inflexible ways that individuals relate to others and view themselves in the world. Referring to the DSM, he explained that persons suffering from a narcissistic personality disorder have grandiose feelings about themselves, *814 have "an idea about their importance that is well beyond their actual importance," require excessive admiration, and have a need to feel powerful. They also "try to associate themselves with people who they think are of high status and will confer upon them an experience that they're important as well." Furthermore, they lack empathy, are exploitive and engage in manipulation. Dr. Harris further explained that people with narcissistic personality disorders have "a great deal of difficulty maintaining their self-esteem" so they resort to a variety of behaviors to rehabilitate themselves.[6]
Relying on his clinical interview of defendant, Dr. Harris characterized him as demonstrating these traits when interrogated. Dr. Harris explained:
[Defendant] reported that immediately he wanted to and he planned that he confessed to everything. . . . "I was confessing to everything. I wanted to be the baddest guy there was."
He reported that he felt important. He reported that they were treating him respectfully. He felt that, you know, he was not  he didn't experience this that he was being investigated for a horrendous crime. He experienced it that they were a team, they were working together, and that he was their equal. And they were, you know, kind of huddling together problem solving together, not that he was the target of this. He didn't experience that he was the target of this.
In his kind of grandiose, inflated way, he thought that he was kind of not only their equal, but in some ways he was their better because he makes a couple of very serious statements. . . . [H]e says that I could close all these cases for them. You know, here are these ineffectual detectives and here I come around and I'm going to just clean up, you know, all these unsolved cases.
And . . . in his confession at the very end, you know, the officers are going through the usual statements that this wasn't coerced from you, we didn't promise anything to you about this to assure that this is not being coerced. And Mr. King's response is basically, hey, you wouldn't even know about this if it weren't for me. I'm the one that brought this to you, which is a remarkably, you know, unusual thing to say, which demonstrates without me, you got nothing. Without me and my helping you, you're ineffectual without me, and I'm the one that is allowing you to close this and to problem solve this. And I am  at that point he feels important and powerful and strong and at least their equal.
Dr. Harris further explained that because the officers were serving defendant donuts and coffee from Dunkin Donuts, and he thought this was the "best coffee there was," he felt the officers were "almost paying homage to him" and giving him "even more than respect" as if "he was being honored in a way." The expert *815 opined that this atmosphere "kind of fed" defendant's "pretty significant vulnerability that he has to needing to feel important even when it costs him." The doctor further explained that defendant "need[ed] to act on that need to be important even if he [was] sacrificing his own freedom."
Dr. Harris also detailed a number of occasions in defendant's past psychiatric history in which he embellished, exaggerated or fabricated his criminal history when talking to mental health professionals. For example, defendant falsely claimed that he had previously served time in prison for murdering a drug dealer, that he had killed nine people and had nine murder charges pending, and that he was a death row inmate.
Dr. Harris also referenced a 1989 psychiatric assessment of defendant, which found a "somewhat grandiose and boastful quality of [his] statements regarding his destructive behavior, and his reports are not entirely consistent." The clinician concluded that defendant "[c]learly" was "invested in his self-identification as a powerful, destructive individual." Dr. Harris noted that what was echoed throughout defendant's prior psychiatric records, and consistent with his assessment, was
how invested and important it is for him to feel strong, powerful, almost invincible, important. And . . . it's important for him to have . . . those aspects of him acknowledged by the people around him, as I described in terms of the issues around narcissistic personality disorder. So he is eager and I think he's compelled to try to impress people to ensure that he comes across as this powerful, even dangerous man. . . .
The fact that defendant made these types of false claims on more than one occasion over a number of years indicated to Dr. Harris longstanding behavior on defendant's part "that is part of him," which is what occurs in an Axis II personality disorder.
Dr. Harris concluded that defendant's report of a false confession was consistent with his mental illness, summarizing defendant's narcissistic traits and longstanding behavioral responses as follows:
[A]s I described the narcissistic personality disorder, which was the need for admiration, the need to feel important, the need to feel powerful, that Mr. King is making these statements at a number of points in his life to augment how he feels about himself. He is looking to the world around him to sustain how he wants to feel. So if he feels that someone admires him or someone is threatened by him, he's going to feel powerful. If he doesn't experience that, he feels depressed, helpless, impotent. So his psychiatric problem is that he needs to find a way to kind of constantly revive his kind of experience of himself, which is this collapsing, you know, impoverished state that he has.
So he goes up to someone and says that he's murdered nine people, and they probably take a step back or their eyes open wide, and . . . he feels better. And he has done this through a number of psychiatric hospitalizations. He's done this elsewhere. And it's certainly possible that his description fits, that this is another aspect of  of his way of maintaining his feeling authentic, of his feeling whole.
Dr. Harris also connected defendant's "vulnerability" with the interrogation process as follows:
I don't think Mr. King was physically vulnerable. . . . [He is] vulnerable in the sense that . . . interpersonally that he is vulnerable. That he's not physically afraid of the detectives, but he is vulnerable to their  to their opinion about him and he is vulnerable to his feeling that *816 they're going to look past him and not think of him as someone who's important. So he is going to try to find a way to correct that. And that's  that's an important vulnerability that he has.

II
The court issued a written opinion dated May 23, 2005, memorialized in an order, finding Dr. Harris' testimony admissible under N.J.R.E. 702, with the principal limitation that he not testify that defendant's psychiatric diagnoses, as they existed on the interrogation date, were causative of false confessions in general or of defendant's claim of false confession. The court explained defendant's reason for offering the expert testimony, i.e., the relevance of the testimony, in pertinent part, as follows:
The idea that a statement against a declarant's penal interest carries with it a certain aura of veracity is also embodied in our rules of evidence, which permit hearsay statements against interest to be admitted into trial without benefit of cross examination. N.J.R.E. 803(c)(25). "The statement-against-interest exception is based on the theory that, by human nature, individuals will neither assert, concede, nor admit to facts that would affect them unfavorably. Consequently, statements that so disserve the declarant are deemed inherently trustworthy and reliable. The law of evidence recognizes that a statement in which a party confesses to having committed a crime subjects the declarant to criminal liability, and therefore constitutes a statement that is against interest." (citation omitted).
In this case, the Defendant seeks to offer expert testimony that certain personality disorders defy the presumption of inherent reliability upon which the statement against interest hearsay exception is premised. The expert would also provide alternative motivations for providing false statements. . . . [P]ersonality disorder character evidence would raise doubts as to the often knee-jerk response a trier of fact gives the veracity of confessions.
. . . .
Dr. Harris offers a reason the Defendant's confession might be false to contrast the usual supposition that confessions, like statements against interests generally, would not be made if they were not true. . . .
The court found that Dr. Harris, as an expert "amply qualified . . . in mental disorders," could assist the jury to understand a specialized subject, i.e. defendant's "psychological makeup," which is beyond its ken, so the factfinder could assess the reliability of defendant's confession within that context. Accordingly, the court found Dr. Harris qualified to testify as a forensic psychiatrist as to his diagnosis of defendant's personality disorders recognized in the DSM-IV (an "uncontroverted . . . recognized authoritative treatise in the field"), the characteristics of the disorders, that defendant suffered from the disorders on the interrogation date, and the historical data (including medical records) upon which he made his diagnosis. The court further found that, although Dr. Harris would not be allowed to testify that defendant had characteristics that would make him more likely to make a false confession, he could express an opinion that defendant's asserted psychiatric disorders are consistent with his claim of false confession.
The court also imposed a limitation on Dr. Harris' testimony regarding statements made to him by defendant and third parties regarding the interrogation process and circumstances surrounding the confession. This order precipitated appeals by both the State and defendant.

*817 III

A.
We first address the State's appeal challenging the admissibility of Dr. Harris' testimony about defendant's asserted personality disorders on the ground that it has no bearing on the issue of defendant's alleged false confession.
Under the Sixth and Fourteenth Amendments of the United States Constitution, a criminal defendant is entitled to present to a jury "competent, reliable evidence bearing on the credibility of [his] confession," particularly when such evidence is central to his claim of innocence, and in the absence of a valid state justification for its exclusion. Crane v. Kentucky, 476 U.S. 683, 690, 106 S.Ct. 2142, 2147, 90 L.Ed.2d 636, 645 (1986); State v. Free, 351 N.J.Super. 203, 213, 798 A.2d 83 (App.Div. 2002). In Crane, a sixteen-year-old defendant unsuccessfully sought to introduce testimony concerning the duration of his interrogation and the manner in which it was conducted in order to show that the confession, which was the primary evidence against him, was unworthy of belief. 476 U.S. at 684-85, 106 S.Ct. at 2143-44, 90 L.Ed.2d at 641-42. In reversing the conviction, the United States Supreme Court held that a criminal defendant is denied his constitutional right to present a complete defense if prohibited from presenting evidence about the "physical and psychological environment" in which the confession was obtained. 476 U.S. at 689, 106 S.Ct. at 2146, 90 L.Ed.2d at 644. The Court recognized that a jury has the duty to assess the reliability of a confession, and reasoned that the environment that yielded the confession can be "of substantial relevance to the ultimate factual issue of the defendant's guilt or innocence" independent of whether the confession was found to be voluntary. Ibid. The Court observed:
Confessions, even those that have been found to be voluntary, are not conclusive of guilt. And, as with any other part of the prosecutor's case, a confession may be shown to be . . . "unworthy of belief." Indeed, stripped of the power to describe to the jury the circumstances that prompted his confession, the defendant is effectively disabled from answering the one question every rational juror needs answered: If the defendant is innocent, why did he previously admit his guilt?
[Ibid.]
Several courts have extended the principle of Crane beyond the external environment of the interrogation that yielded the confession to permit expert testimony of a defendant's psychological makeup and internal psychological characteristics impacting on the reliability of the confession. In People v. Hamilton, 163 Mich.App. 661, 415 N.W.2d 653 (1987), the Michigan Court of Appeals reversed a murder conviction because of the trial court's exclusion of testimony by a clinical psychologist as to how the defendant's psychological makeup might have affected his statements to the police. The Court stated, "Crane did not concern evidence of the defendant's psychological makeup, but focused instead on the physical and psychological aspects of an interrogation. Nonetheless, we believe the United States Supreme Court's reasoning is equally applicable to otherwise admissible expert testimony." Id. at 655; see also, State v. Oliver, 280 Kan. 681, 124 P.3d 493, 505-09 (2005) (holding psychologist's testimony of the defendant's post-traumatic stress disorder and dependent personality disorder admissible as part of the psychological environment under Crane as bearing on defendant's ability to respond reliably to interrogation, but finding preclusion of testimony harmless error), cert. denied, ___ U.S. ___, 126 S.Ct. *818 2361, 165 L.Ed.2d 286 (2006); State v. Buechler, 253 Neb. 727, 572 N.W.2d 65, 71-74 (1998) (reversing a murder conviction, holding that under Crane a clinical psychologist should have been allowed to testify that the defendant's drug withdrawal and psychological disorders may have resulted in a false confession, as such testimony pertained to the psychological circumstances under which the defendant confessed and had a bearing on the reliability of the confession); Pritchett v. Commonwealth, 263 Va. 182, 557 S.E.2d 205, 208 (2002) (same as to testimony of clinical and forensic psychologists about the defendant's mental retardation and vulnerability to interrogative suggestibility).
A defendant's ability to present this kind of exculpatory evidence, however, is not without limitation. As the Court noted in Crane, its admission is subject to the rules of evidence, which "serve the interests of fairness and reliability." 476 U.S. at 690, 106 S.Ct. at 2146, 90 L.Ed.2d at 644.
Defendant's proffer here is to provide the jury with evidence that has the capacity to reasonably rebut the natural inference that an individual would not be likely to make a statement to law enforcement officials contrary to his or her penal interest unless it were true. The proffered evidence provides a psychologically-based reason other than truth for the jury's consideration, namely that defendant's confession was related to and consistent with his narcissistic and antisocial personality disorders. If the jury finds this reason persuasive, it might harbor a reasonable doubt as to the reliability of defendant's confession. This confession is the linchpin of the State's case as there apparently is no physical evidence linking defendant to the murder. We are therefore satisfied that the proffered evidence is relevant. See N.J.R.E. 401; see also Model Jury Charge (Criminal), "Statements of Defendant" (1996) ("In considering whether or not the statement is credible, you should take into consideration the circumstances and facts as to how the statement was made, as well as all other evidence in this case relating to this issue." (emphasis added)).

B.
What remains for our consideration is whether the proffered evidence is competent. We believe it is.
N.J.R.E. 702 governs the admission of expert testimony. The rule provides that "scientific, technical or other specialized knowledge" by a witness "qualified as an expert by knowledge, skill, experience, training, or education" may be admissible "in the form of an opinion or otherwise" if the expert testimony will assist the jury "to understand the evidence or to determine a fact in issue." The rule imposes three basic requirements for the admission of expert testimony:
(1) the intended testimony must concern a subject matter that is beyond the ken of the average juror;
(2) the field testified to must be at a state of the art such that an expert's testimony could be sufficiently reliable; and
(3) the witness must have sufficient expertise to offer the intended testimony.
[State v. Kelly, 97 N.J. 178, 208, 478 A.2d 364 (1984); see also State v. Townsend, 186 N.J. 473, 491, 897 A.2d 316 (2006).]
In order to analyze Dr. Harris' testimony, we must view it in the context of this particular defendant. It is undisputed that defendant has had a longstanding psychiatric history. The defense seeks to offer Dr. Harris to summarize defendant's *819 mental health history and explain his diagnosis of defendant's personality disorders, the characteristics of the disorders, how these characteristics appear to have manifested in defendant during the interrogation, and how his behavior during the interrogation, including his claimed false confession, is consistent with his mental condition at that time. In that way, the jury would have a better understanding of defendant's mental condition at the time of the interrogation, and whether that personality disorder impacted on defendant's behavior and affected the reliability of defendant's confession to Rush's murder. Dr. Harris is not being offered to testify that defendant's confession was false or that his mental condition caused him to falsely confess.
The State contends Dr. Harris lacks the credentials and experience to provide any psychological testimony pertaining to false confessions, emphasizing that he only attended two workshops at the American Academy of Psychiatry and the Law on false confessions and was never previously qualified as an expert in that specialized field. We disagree. Dr. Harris has extensive credentials and clinical experience in psychiatry and has testified in court as a forensic psychiatric expert on more than 100 occasions. We are satisfied, as was the trial court, that Dr. Harris possesses sufficient expertise in the field of forensic psychiatry to apply regularly accepted psychiatric principles in assessing defendant's personality disorder in the context presented, i.e. the giving of a statement to the police. Dr. Harris' lack of experience in the specific area of false confessions, which he described as an exceptionally narrow field in forensic psychiatry, is a matter of weight, not admissibility.
We are also satisfied that expert testimony pertaining to such psychiatric diagnoses and the analysis of defendant's psychological makeup is beyond the ken of the average juror. See State v. Townsend, supra, 186 N.J. at 491, 897 A.2d 316 (holding that battered women's syndrome is an appropriate subject for expert testimony); State v. Kelly, supra, 97 N.J. at 187, 478 A.2d 364 (same); State v. R.W., 104 N.J. 14, 30-31, 514 A.2d 1287 (1986) (holding that expert testimony is appropriate to explain the behavior, feelings and attitudes of victims of child abuse "when it is shown that their condition is not readily understood by persons of average intelligence and ordinary experience"); Biunno, Current N.J. Rules of Evidence, comment 1 on N.J.R.E. 702 (2006).
The primary focus of this case is on the second prong of N.J.R.E. 702, scientific reliability. According to the State, the trial court should have ruled the proffered testimony inadmissible as not scientifically reliable under Frye v. United States, 54 App.D.C. 46, 293 F. 1013, 1014 (1923), because the psychiatrist did not refer to an authoritative source or study specifically linking the asserted mental health condition with the making of a false confession or a vulnerability to make a false confession. Moreover, the State argues that once the trial court acknowledged that defendant had not shown that a narcissistic and antisocial personality disorder was generally accepted in the scientific community as the cause of false confessions, it was inconsistent with and contrary to law for it to permit Dr. Harris to testify that defendant suffered from a personality disorder that was consistent with his claim of false confession. Additionally, the State contends there was no factual support for Dr. Harris' conclusions, as there was no evidence that defendant falsely confessed to murdering anyone other than Ryan and Rush. Moreover, it contends there was no nexus between defendant's narcissism with *820 its alleged vulnerability and his claim of falsely confessing to Rush's murder, particularly in view of defendant's truthful prior confession around the same time frame as Ryan's murder. We are not persuaded by these arguments.
As the trial court appropriately recognized, the testimony of Dr. Harris is required to satisfy the Frye test. Frye v. U.S., supra, 293 F. at 1014. In criminal cases, our Supreme Court has continued to apply the "general acceptance standard by the relevant scientific community," established in Frye, for determining the scientific reliability of expert testimony. State v. Harvey, 151 N.J. 117, 169-170, 699 A.2d 596 (1997); State v. Spann, 130 N.J. 484, 509-10, 617 A.2d 247 (1993); State v. Free, supra, 351 N.J.Super. at 214, 798 A.2d 83. Psychiatric testimony falls within the category of scientific evidence. See State v. Free, supra, 351 N.J.Super. at 214, 798 A.2d 83.
General acceptance and reliability of scientific evidence can be established by expert testimony, authoritative scientific literature, or persuasive judicial opinions. State v. Harvey, supra, 151 N.J. at 170, 699 A.2d 596 (quoting State v. Kelly, supra, 97 N.J. at 210, 478 A.2d 364). All three methods are satisfied here.
In Free, we deemed inadmissible the testimony of Dr. Kassin, a social psychologist, offered by the defendant as an expert in police interrogations and false confessions, to attack the credibility of the defendant's confessions. 351 N.J.Super. at 205, 798 A.2d 83. The trial court noted that Dr. Kassin had "dealt with the situation or circumstances of [the defendant's] statements but not with [the defendant] to any meaningful degree" and that his opinions were "based on the setting in which the statements were given and not on [the defendant] as an individual." Id. at 212, 798 A.2d 83. The trial court incorrectly applied the Daubert[7] standard rather than Frye, and did not find that Dr. Kassin's evidence was based on science, but rather was admissible as specialized knowledge. Id. at 211, 215, 798 A.2d 83. We analyzed the proffered testimony under the Frye test and reviewed judicial opinions from other jurisdictions addressing the admissibility of social psychologist testimony respecting the police environment and susceptibility to false confessions. For a variety of reasons, we were not satisfied there was evidence of general acceptance of Dr. Kassin's principles and methodology in the relevant community to render the opinions in his report scientifically reliable. A primary deficiency, pertinent to the issue in the present case, was that the testimony of the social psychologist merely pertained to the "effects, in general, of police interrogation techniques." Id. at 213, 798 A.2d 83. We contrasted that with clinical testimony about a defendant's psychological disorders, which has been found to be admissible as relevant to a defendant's confession, stating:
[W]e acknowledge that some forms of psychological testimony on the credibility of a defendant's confession have been found to be admissible because they were considered to be reliable. See, e.g., U.S. v. Shay, 57 F.3d 126 (1st Cir. 1995); Beagel v. State, 813 P.2d 699 (Alaska Ct.App.1991); and Commonwealth v. Banuchi, 335 Mass. 649, 141 N.E.2d 835 (Ma.1957). However, in each of those cases the psychological testimony concerned scientifically recognized mental *821 disorders relevant to each defendant's confession, rather than, as here, testimony about the effects, in general, of police interrogation techniques. . . .
[Ibid.]
In contrast to the social psychologist in Free, Dr. Harris interviewed and clinically evaluated defendant and reviewed his extensive psychiatric history in order to assess defendant's individual psychiatric composition and diagnose a scientifically recognized mental disorder relevant to his confession. Using his professional expertise, Dr. Harris diagnosed defendant with a personality disorder recognized in the DSM-IV, an authoritative treatise in the field, and explained the behavioral characteristics associated with that disorder, as contained in the DSM. As the trial judge noted,
There is an agreement among psychiatrists on characteristics of certain personality disorders and the general characteristics of an individual diagnosed with such disorders. . . . The manual confirms Dr. Harris' descriptions of behavioral characteristics associated with narcissistic and antisocial personality disorders: "Reflecting aberrant behaviors of a grandiose sense of self importance and lack of empathy; deceit and manipulation to gain personal advantage."
General acceptance of the DSM in the psychiatric community is beyond dispute. Furthermore, it is clear that Dr. Harris' testimony was based on the relevant provisions of the DSM. Dr. Harris applied the DSM principles to this defendant based on his clinical evaluation and review of pertinent materials, including defendant's psychiatric history, explaining how the DSM characteristics of his narcissistic and antisocial personality disorders manifested themselves in the specific circumstances of defendant's interrogation.
It is not fatal to the scientific reliability of Dr. Harris' proffered testimony that he was unable to present any supporting studies dealing specifically with false confessions. His proffered testimony does not deal with causation. The proffer is that the presence of the disorders renders a person vulnerable to making a false confession and provides an explanation, other than truth, for the statements. Thus, it was neither illogical nor erroneous for the trial court to permit Dr. Harris to testify that defendant suffered from a personality disorder that was "consistent with" his claim of making a false confession, though not "causative" of such claim. The State's arguments that the record does not support defendant's claim that he falsely confessed to murdering anyone other than Ryan and Rush or establish a nexus between the vulnerable qualities of a narcissistic personality disorder and defendant's claim of making a false confession, go to the weight of Dr. Harris' opinion, not its admissibility.
We also find persuasive judicial decisions in other jurisdictions supporting the reliability of the proffered evidence. Two of these cases, Beagel and Shay, we cited in Free as recognition that some forms of psychological testimony on the credibility of a defendant's confession have been found to be admissible because they were considered to be reliable. State v. Free, supra, 351 N.J.Super. at 213, 798 A.2d 83. See U.S. v. Shay, supra, 57 F.3d at 126 (finding error by the trial court in excluding expert testimony that the defendant suffered from pseudologia fantasia, "Munchausen's disease," an extreme form of pathological lying, which is a recognized mental disease in the DSM, and which caused him to make false statements contrary to his apparent self-interest); see also, State v. Oliver, supra, 124 P.3d at *822 493; State v. Buechler, supra, 572 N.W.2d at 65.
In Beagel, the Alaska Court of Appeals reversed the defendant's conviction for manslaughter based on the trial court's exclusion of psychiatric testimony that the defendant's statements claiming responsibility for the shooting were a product of hysteria and confabulation caused by psychogenic amnesia. 813 P.2d at 707. In a pre-trial hearing precipitated by the State's motion to bar the testimony, the psychiatrist had read from the glossary of the Comprehensive Textbook of Psychology and presented definitions and characteristics of the dissociative disorder, psychogenic fugue, from the DSMR-III (an earlier edition of the DSM-IV), which he testified were authoritative treatises in the field. Ibid. The trial court found, in part, that the defendant had not shown that the expert's testimony was based on generally accepted principles in the field of psychiatry under Frye.[8]Ibid. In reversing, the Court of Appeals stated:
[W]e are convinced that the trial court abused its discretion in refusing to admit the testimony. Dr. Wolf's testimony, if believed by the jury, was critically important to Beagel's defense. Wolf's testimony purported to explain why Beagel might make false statements indicating that she had shot her husband.
. . . .
In this case, it is uncontested that Dr. Wolf was a qualified psychiatrist. He testified that his opinion was based on a standard diagnosis which was contained in the Comprehensive Textbook of Psychology and the DSMR-III, which are reliable psychiatric authorities. Wolf's testimony established at least a prima facie case that his testimony was based on principles which had gained general acceptance in the field of psychiatry.
[Id. at 707-08].
We find persuasive the Alaska Court of Appeals' focus on the expert's diagnosis of the defendant's medically-recognized psychiatric condition under the DSM as prima facie evidence to satisfy the Frye general acceptance prong of scientific reliability. We note the absence of any studies or scientific testimony linking the defendant's psychiatric fugue state to false confessions, which apparently had no impact on the appellate court's Frye analysis.
We are satisfied that Dr. Harris' testimony pertaining to defendant's narcissistic and antisocial personality disorders, recognized medical conditions in the DSM, has similar indicia of reliability in the psychiatric community to satisfy the threshold requirement of Frye. Accordingly, there is no evidentiary impediment to the proffered testimony as structured by the trial court.

IV
We now address defendant's appeal of the portion of the order that restricts his expert from testifying about any out-of-court statements relating to defendant's confession. More particularly, the order prohibits Dr. Harris from testifying "as to anything the defendant or anyone else told him about the circumstances surrounding the giving of the confession. . . ." (emphasis added). Defendant is concerned with the broad brush of the order, which appears to prohibit his expert from testifying about anything he was told during his clinical interview of defendant and by third parties about the circumstances of the interrogation process. According to defendant, such a sweeping ruling *823 would have a devastating impact on the ability to present his case because defendant's medical records and the statements made to Dr. Harris during his clinical assessment allowed him to make a "clear diagnosis" of "severe personality disorders." They also formed part of the basis for his opinion that defendant's psychiatric makeup and diagnosis are consistent with his claim of providing a false confession to Rush's murder. Defendant also argues that without being able to explain the basis for his diagnosis of defendant and his analysis of defendant's behavior at the time of the interrogation, Dr. Harris would be left with an impermissible net opinion. Moreover, defendant claims it is equally important that Dr. Harris be permitted to refer to statements of other individuals, such as the police officers and investigators, who interrogated defendant, and Assistant Prosecutor Gordon, who provided information to defense counsel regarding defendant's attempts to confess to other murders. As Dr. Harris conceded, if defendant did not make any attempt to give false confessions on March 14, 2003, his opinion would be undermined.
It is clear from the trial judge's opinion that she did not restrict Dr. Harris' reference to defendant's medical records. Her focus was on statements by defendant and members of law enforcement. The opinion states:
[W]hat actually occurred during the police interrogation will not be tried through expert testimony. Dr. Harris will not be allowed to discuss defendant's position concerning what did or did not occur during the interview. Moreover, he will not be permitted to disclose what third parties might have disclosed to him regarding the veracity of defendant's statements (as the veracity of a witness's statement belongs to the jury). (citation omitted).
N.J.R.E. 703 permits an expert witness to base his or her opinion on facts not admissible in evidence. The rule provides:
The facts or data in the particular case upon which an expert bases an opinion or interference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.
We have recognized the longstanding law in New Jersey that "hearsay statements upon which an expert relies are admissible, not for [the purpose of] establishing the truth of their contents, but to apprise the jury of the basis of the opinion reached." State v. Farthing, 331 N.J.Super. 58, 77, 751 A.2d 123 (App.Div.), certif. denied, 165 N.J. 530, 760 A.2d 784 (2000). An expert witness, however, should not be used "as a means to defeat the normal prohibition against the admission of hearsay" and "should not be permitted to serve as a conduit for alerting the jury to evidence it would not otherwise be allowed to hear." State v. Burris, 298 N.J.Super. 505, 512, 689 A.2d 860 (App.Div.), certif. denied, 152 N.J. 187, 704 A.2d 17 (1997).
We discern no abuse of discretion in the court's ruling with respect to statements or information provided by the interrogating officers, investigators and, particularly, Assistant Prosecutor Gordon regarding defendant's false confessions to other crimes. Based on the testimony of the interrogating officers and investigators presented at the Rule 104 hearing, it seems clear defendant did not sign confessions to any other murders and it appears he did not make an unequivocal statement that he murdered the woman at Popeye's. It also appears that much of defendant's reference to other crimes was non-specific *824 as to details or "involvement." It would thus be prejudicial to the State to allow Dr. Harris to characterize the testimony of the interrogating officers as acknowledging defendant's "involvement" in the Popeye's crime, for example, as confessing to the murder. Defendant can present the testimony of any of these witnesses, or can cross-examine the State's witnesses, in support of his claim that he gave or tried to give other false confessions during the interrogation. The "joking" comment made by Assistant Prosecutor Gordon, who was not even present at the interrogation, was based on nothing more than a rumor and was conveyed third-hand to Dr. Harris through defense counsel. As the court noted, this is not the type of evidence that is reliable or competent.
Defendant's statements to the forensic psychiatrist made during the interviews present a different situation. Our courts have consistently held that a psychiatrist in a criminal case may testify as to what a defendant told him or her if the expert relied on the statements in formulating an opinion about the defendant's mental or psychiatric condition, and such hearsay declarations "constituted a necessary element in the formulation of [the] opinion." State v. Lucas, 30 N.J. 37, 79, 152 A.2d 50 (1959); see also State v. Loftin, 146 N.J. 295, 359, 680 A.2d 677 (1996); State v. Farthing, supra, 331 N.J.Super. at 77-78, 751 A.2d 123; State v. Burris, supra, 298 N.J.Super. at 512, 689 A.2d 860.
Of course, these hearsay statements are not admitted for their truth, and the expert's testimony must be circumscribed by an appropriate limiting instruction. See, e.g., State v. Burris, supra, 298 N.J.Super. at 512-13, 689 A.2d 860 (a charge should be given "to the effect that [the evidence] should not be considered by the jury as substantive evidence relating to the question of guilt or innocence of the accused, but only as evidence tending to support the ultimate expert conclusion of the psychiatrist" (quoting State v. Lucas, 30 N.J. at 79, 152 A.2d 50)); State v. Vandeweaghe, 351 N.J.Super. 467, 480-81, 799 A.2d 1 (App.Div.2002) (if the expert relied upon the "truth of the matter asserted in formulating an opinion rather than the fact that the statement was made, the jury should be instructed that the probative value of the opinion is dependent upon, and no stronger than, those facts"), aff'd, 177 N.J. 229, 827 A.2d 1028 (2003). Moreover, if the psychiatrist's opinion hinges upon the truth of defendant's statement, the jury should be further instructed that the probative value of the psychiatrist's opinion will depend upon whether there is independent proof of the hearsay statement. State v. Burris, supra, 298 N.J.Super. at 513, 689 A.2d 860; see also Model Jury Charge (Criminal), "Expert Testimony" (2003).
We are mindful of the trial court's concern about the potential for defendant to allow Dr. Harris to parrot and place before the jury defendant's version of what occurred during the interrogation, without the State's ability to cross-examine defendant. The trial court, however, erred in imposing a blanket prohibition that appears to bar testimony by Dr. Harris as to any statements made by defendant to him during the clinical interviews pertaining to the interrogation. With this limitation, we cannot perceive how Dr. Harris will be able to provide a factual basis for his opinions and present anything other than a net opinion, unworthy of any consideration. See Pressler, supra, comment 1 on N.J.R.E. 702 and comment 3 on N.J.R.E. 703; Buckelew v. Grossbard, 87 N.J. 512, 524-25, 435 A.2d 1150 (1981).
We believe a general rule of guidance is the wiser course in the posture of this case. We do not want to interfere with the parties' abilities to try their cases. We do not believe it would be appropriate at *825 this time to rule on each specific statement or category of statement made by defendant to which Dr. Harris can testify. Therefore, within the guidelines of N.J.R.E. 703 and the case law, Dr. Harris shall be permitted to testify as to those statements made to him by defendant during the clinical interviews pertaining to the interrogation that he relied on and were essential to his diagnosis of defendant's personality disorders and formulation of his medical opinion that these disorders are consistent with defendant's claim of false confession. Moreover, the information should be of a type typically relied upon in the psychiatric community in making such assessments and diagnoses. If necessary, the trial court can conduct further Rule 104 hearings with respect to specific evidence as the testimony is presented.

VI
In summary, we affirm on the State's appeal. Dr. Harris shall be permitted to testify at trial as an expert in forensic psychiatry and opine that defendant's psychiatric disorders are consistent with defendant's claim of false confession. We affirm on that portion of defendant's appeal challenging the restriction on Dr. Harris from testifying about what law enforcement personnel told him about the interrogation. We reverse that portion of the order barring testimony by Dr. Harris as to any statements made by defendant to him during the clinical interviews pertaining to the interrogation. Dr. Harris may testify to such statements to the extent and within the guidelines we have set forth, with an appropriate limiting instruction.
Affirmed in part and reversed in part.
NOTES
[1] The order further provided, "the court finds that there is no scientific reliability to the opinion of Dr. Harris given during the Evidence Rule 104 hearing that defendant's psychiatric diagnoses, as they existed [at the time of the confession] are causative of defendant's claim of false confession or to false confessions in general." Defendant did not seek leave to appeal from this provision of the judge's order.
[2] Defendant subsequently pled guilty to aggravated manslaughter of Ryan and, according to the judgment of conviction, received a twenty-five year prison term.
[3] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[4] Gordon testified in response to a subpoena issued by the defense.
[5] Dr. Harris also conducted and testified about a Gudjonsson Suggestibility Scales (GSS) test, which tests for vulnerability to false confessions. However, due to insufficient proofs, the defense no longer intends to offer Dr. Harris' testimony concerning the GSS scales or the principles underlying them related to police interrogation. Harris testified the GSS tests "echoed [his] clinical assessment." We are satisfied Dr. Harris' clinical assessment itself provides an independent basis for his opinion that defendant's claim of false confession is consistent with the nature and characteristics of his personality disorder.
[6] Dr. Harris also diagnosed defendant as suffering from an Axis I schizoaffective disorder, bi-polar type, which often changes over time. He found defendant to be largely asymptomatic of this condition at the time of the interrogation and therefore did not correlate defendant's schizoaffective diagnosis with his false confession claim.

Dr. Harris' primary diagnosis is narcissistic personality disorder. Dr. Harris explained that antisocial personality disorder is an exaggerated or greater degree of narcissism where a person feels entitled to do anything they want, including lying. Dr. Harris opined that defendant had some of the characteristics of a borderline personality disorder, such as impulsivity and emotional instability, but he did not meet the full criteria in the DSM-IV for that disorder.
[7] Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).
[8] Subsequently, Alaska became a Daubert state. See State v. Coon, 974 P.2d 386 (Alaska 1999).